**ALLIANCE FOR CLEAN COAL,**
a Virginia not-for-profit
corporation, Plaintiff,

v.

**Ellen C. CRAIG, Terrence L. Barnich, William M. Dickson, Ruth K. Kretschmer, Karl A. McDermott, Lynn M. Shishido–Topel and David S. Williams, in their official capacities as, respectively, Chairman and Commissioners of the Illinois Commerce Commission, Defendants.**

**No. 93 C 4391.**

United States District Court,
N.D. Illinois, E.D.

Dec. 15, 1993.

---

Gerald Owen Sweeney, Jr., Damon N. Vocke, R.R. McMahan, Lord, Bissell & Brook, Chicago, IL, for plaintiff.

John W. McCaffrey, Asst. Atty. Gen., Edward P. O'Brien, Asst. Atty. Gen., Roland W. Burris, Atty. Gen., Chicago, IL, for defendants, E. Craig, T. Barnich, W. Dickson, R. Kretschmer, K. McDermott, L. Shishido–Topel, D. Williams.

Owen Eliot MacBride, Robert D. Campbell, Eric Lewis Lohrenz, Schiff, Hardin & Waite, Chicago, IL, for Ruth K. Kretschmer, defendant, and Illinois Power Co., amicus curiae.

Barbara J. Hillman, Michael H. Holland, Cornfield and Feldman, Chicago, IL, for Karl A. McDermott, defendant, and United Mine Workers of America, amicus curiae.

Edgar N. James, Holly B. Fechner, Guerrieri, Edmond & James, Washington, DC, for Karl A. McDermott.

Georgene M. Wilson, Sweeney & Ryman, Ltd., Chicago, IL, for State of Montana and State of Wyo., amicus curiae.

### MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

The Alliance for Clean Coal ("the alliance") sues the Illinois Commerce Commission ("the commission") and the members of the com-

mission in their official capacities (collectively "the state"). The alliance contends that the Illinois Coal Act, 220 ILCS 5/8–402.1 ("the coal act"), creates barriers to interstate commerce on its face and in effect. The alliance seeks a declaratory judgment that the coal act violates Article I, Section 8 of the United States Constitution ("the commerce clause") and seeks an injunction: (1) barring the state from enforcing the coal act; and (2) invalidating environmental compliance plans the commission already has approved in reliance on the coal act. The state responds that the coal act does not violate the commerce clause on its face or in effect. The alliance and the state both move for summary judgment.[1]

### BACKGROUND

#### 1. The Coal Industry

Coal is produced in over half the states and is sold in a highly competitive interstate market. In 1992, 998 million tons of coal were produced in 27 states. Most of that coal was used by electric utilities, which burned 783 million tons (78 percent of the total market). Coal is the principal fuel source for electricity generators, accounting for 56 percent of all electricity generated in 1992. Coal is also burned by other large industrial facilities. *See* Alliance Ex. 10.

All coal is not alike. Coal mined in the states west of the Rocky Mountains ("western states") generally has a lower sulfur content than coal mined east of the Rockies ("eastern states"). Most coal mined in Illinois has a relatively high sulfur content. When coal is burned, sulfur dioxide is emitted in direct proportion to its sulfur content. In light of increasing air pollution problems, reducing sulfur dioxide emissions has become a national priority. One way for coal-burning facilities to reduce sulfur dioxide emissions is simply to burn lower-sulfur coal. *See generally* Bruce A. Ackerman & William T. Hassler, *Clean Coal/Dirty Air* (1981).

#### 2. The Clean Air Act

In 1970, Congress responded to the problem of atmospheric emissions by amending the Clean Air Act ("the 1970 clean air act"). The 1970 clean air act authorized the Environmental Protection Agency ("EPA") to set new source performance standards to regulate various emissions, including sulfur dioxide. *See* 42 U.S.C. § 7411 (1970) (amended 1977). In promulgating emissions standards for new sources, the EPA approved two methods for controlling sulfur dioxide emissions: (1) the use of low sulfur coal; and (2) the use of pollution control devices ("scrubbers") to reduce emissions before they could reach the atmosphere.

In 1977, Congress amended the clean air act ("the 1977 clean air act") by requiring new or modified sources to use the "best technological system ... adequately demonstrated" to reduce sulfur dioxide emissions. 42 U.S.C. § 7411(a)(1) (1977) (amended 1990). Under the 1977 clean air act, the EPA set standards requiring percentage decreases of sulfur dioxide emissions. *See Sierra Club v. Costle*, 657 F.2d 298 (D.C.Cir. 1981) (upholding EPA's promulgation of percentage reduction standards under the 1977 clean air act). Whereas under the 1970 clean air act, coal-burning electric plants could choose the best (*i.e.*, the cheapest) means of compliance, under the 1977 clean air act, new facilities effectively were required to build scrubbers regardless of the sulfur content of the coal they burned and regardless of cost.

In 1990, Congress once again amended the clean air act, adding an acid rain reduction program which mandates drastic reductions in industrial sulfur dioxide emissions. *See* 42 U.S.C. §§ 7651–7661f ("the 1990 clean air act"). Under phase I of the 1990 clean air act, the 110 largest coal-burning facilities in 21 states must meet an intermediate sulfur dioxide emissions limit by 1995. *See* 42 U.S.C. § 7651c. Under phase II of the 1990 clean air act, all facilities will be required to meet more stringent emissions limitations,

---

1. The states of Montana and Wyoming file an *amicus curiae* brief in support of the alliance's motion for summary judgment; the United Mine Workers of America, Illinois Power Co., and the Illinois Coal Association all file *amicus curiae* briefs in opposition to the alliance's motion for summary judgment. In the discussion, arguments raised in the *amicus* briefs are attributed to the parties.

starting in 2000. *See* 42 U.S.C. § 7651d. Under the 1990 clean air act, coal-burning electric plants again will be free to comply with sulfur dioxide emissions standards in the cheapest way possible. The principle methods for complying with the phase II limitations will be installing new scrubbers, using lower sulfur coal, switching to another fuel source, or buying or offsetting emissions.[2]

### 3. The Public Utilities Act And The Coal Act

The Illinois Public Utilities Act ("the utilities act"), empowers the commission to regulate the Illinois public utility industry. *See* 220 ILCS 5/2–101. In regulating public utilities, the commission must maintain the objectives of "adequate, efficient, reliable, environmentally safe and least-cost public utility services. . . ." 220 ILCS 5/1–102; *see also* 220 ILCS 5/8–402 (imposing similar duty on public utilities themselves).

In 1991, the Illinois General Assembly passed the coal act to amend the utilities act by adding a new section concerning Illinois' implementation of and compliance with the 1990 clean air act. *See* 220 ILCS 5/8–402.1. Under the coal act, public utilities must devise clean air act compliance plans and present the plans to the commission for approval. *Id.* at (c). In devising and approving clean air act compliance plans, public utilities and the commission are required to:

> take into account the need for utilities to comply in a manner which minimizes to the extent consistent with the other goals and objectives of this Section the impact of compliance rates for service, the need to use coal mined in Illinois in an environmentally responsible manner in the production of electricity, and the need to preserve as a valuable state resource the mining of coal in Illinois.

220 ILCS 5/8–402.1(a)(i). In addition, the coal act declares that the construction of scrubbers:

at existing large generating units burning Illinois coal as a fuel source can be an environmentally responsible and cost effective means of compliance when the impact on personal income in this State of changing the fuel used at such generating units so as to displace coal mined in Illinois is taken into account.

*Id.* at (ii). Consequently, every generator composed of two or more units with a capacity greater than 500 megawatts[3] must "include in its Clean Air Act compliance plan the installation of pollution control devices [*i.e.*, scrubbers] . . . to enable [the units] to continue to burn Illinois coal." *Id.* at (a)(ii), (e).

The alliance contends that the coal act impermissibly favors in-state interests by requiring the commission to base compliance decisions on the use of Illinois coal and by requiring public utilities to consider building scrubbers designed to use Illinois coal in their operations. The alliance asserts that the coal act burdens interstate commerce and is unconstitutional on its face and in effect. The state responds that the coal act does not violate the commerce clause on its face or in effect, and asserts, in the alternative, that the coal act is justified by legitimate state interests.

### DISCUSSION

### 1. Summary Judgment

A movant is entitled to summary judgment when the moving papers and affidavits show there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); *Local 103 v. Babcock & Wilcox*, 1 F.3d 589, 591 (7th Cir.1993). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty*

---

2. The 1990 act implements a market-driven approach to environmental regulation. The EPA provides utilities emission allowances permitting them to emit a specified amount of sulfur dioxide. The utility may use its allowances or it may "overcomply" and sell unused allowances under a free market system. *See* Note, "Emissions Trading To Reduce Acid Deposition," 100 Yale L.J. 2707 (1991).

3. There are four affected plants in Illinois.

*Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

In considering a motion for summary judgment, the court must consider all evidence in the light most favorable to the nonmoving party. *See Local 103,* 1 F.3d at 591; *Biddle v. Martin,* 992 F.2d 673, 675 (7th Cir.1993). However, once the moving party meets its burden of production, the nonmoving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510; *Hickey v. A.E. Staley Mfg.,* 995 F.2d 1385, 1388 (7th Cir.1993). Where the nonmovant fails to make a sufficient showing on an essential element of the case on which it would bear the burden of proof at trial, summary judgment is proper. *See Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53.

In this case, there are no genuine issues of material fact;[4] summary judgment therefore is appropriate. The only contested question in this case is whether the coal act impermissibly restricts the free flow of interstate commerce. Both the alliance and the state move for summary judgment, contending that they must prevail as a matter of law. Accordingly, the question is not whether summary judgment is appropriate, but which side must prevail.

## 2. The Commerce Clause

The commerce clause grants Congress exclusive power "to regulate Commerce with foreign nations, and among the several states." U.S. Const., art. I, § 8, cl. 3. Although the commerce clause does not expressly address the power of the states to regulate commerce within their borders, the Supreme Court has long held that the "negative" or "dormant" commerce clause prohibits the states from restricting or burdening interstate commerce. *See Cooley v. Board of Wardens,* 53 U.S. (12 How.) 299, 313, 13 L.Ed. 996 (1852); *H.P. Hood & Sons, Inc. v.*

*Du Mond,* 336 U.S. 525, 534–35, 69 S.Ct. 657, 663, 93 L.Ed. 865 (1949); *Hughes v. Oklahoma,* 441 U.S. 322, 326, 99 S.Ct. 1727, 1731, 60 L.Ed.2d 250 (1979). The commerce clause is based on the theory that the United States is one indivisible economic unit. It represents the framers' vision that "the peoples of the several states must sink or swim together, and that in the long run prosperity and salvation are in union not division." *Baldwin v. G.A.F. Seelig,* 294 U.S. 511, 523, 55 S.Ct. 497, 500, 79 L.Ed. 1032 (1935).

■ A state statute may violate the commerce clause either by discriminating against out-of-state economic interests or by benefitting in-state interests. *See Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 273, 104 S.Ct. 3049, 3056, 82 L.Ed.2d 200 (1984) ("it is irrelevant to the Commerce Clause inquiry that the motivation of the legislature was the desire to aid [in-state interests] rather than to harm out-of-state producers"); *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 273–74, 108 S.Ct. 1803, 1807–08, 100 L.Ed.2d 302 (1988) (same). Thus, the court must decide whether the coal act "is just a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns with effects upon interstate commerce that are only incidental." *City of Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2536, 57 L.Ed.2d 475 (1978).

■ A statute may violate the commerce clause even without demonstrable economic effects.[5] The Supreme Court has held that "where discrimination is patent ... neither a widespread advantage to in-state interests nor a widespread disadvantage to out-of-state competitors need be shown." *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 276, 108 S.Ct. 1803, 1809, 100 L.Ed.2d 302 (1988). If a statute clearly is designed to burden interstate commerce, it is repugnant to the commerce clause regardless of the amount of commerce actually effected.

---

4. The alliance and the state both raise factual issues concerning the practical effects of the coal act. However, as will be discussed below, the actual economic effects of a challenged statute are irrelevant for purposes of commerce clause analysis.

5. Indeed, "the negative implications of the commerce clause derive principally from a *political* theory of union, not from an *economic* theory of free trade." Laurence H. Tribe, *American Constitutional Law,* § 6–7 (2d ed. 1988) (emphasis in original).

*See Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 269, 104 S.Ct. 3049, 3054, 82 L.Ed.2d 200 (1984).

▮ Courts use two different tests to determine whether a statute is constitutional under the commerce clause. A state statute that burdens interstate commerce "either on its face or in practical effect," is unconstitutional unless the state can demonstrate that the statute serves a legitimate local purpose that could not be achieved through nondiscriminatory means. *See Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979); *Maine v. Taylor,* 477 U.S. 131, 138, 106 S.Ct. 2440, 2447, 91 L.Ed.2d 110 (1986).[6] In contrast, a statute that is neutral on its face, and has indirect or incidental effects on interstate commerce, is constitutional if any burdens on interstate commerce are outweighed by the local benefits. *See Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 847, 25 L.Ed.2d 174 (1970).

### 3. The Coal Act

#### a. The coal act clearly burdens interstate commerce

▮ The alliance challenges two aspects of the coal act. First, the coal act requires[7] public utilities and the commission, in complying with the 1990 clean air act, to take into account "the need to use coal mined in Illinois" and "the need to preserve as a valuable state resource the mining of coal in Illinois." 220 ILCS 5/8–402.1(a)(i). In addition, the coal act directs the four largest public utility plants in Illinois to include in their clean air act compliance plans "the installation of pollution control devices for the control of sulfur dioxide emissions ... to enable them to continue to burn Illinois coal." *Id.* at (e).

The coal act does not directly require Illinois public utilities to use Illinois coal. Rather, it requires utilities and the commission to take into account "the need to use Illinois coal in an environmentally responsible manner" as a factor in forming and approving clean air act compliance plans. A compliance plan that the commission ultimately approves need not include the use of Illinois coal; the use of Illinois coal is one factor to be considered along with the other goals and objectives of the utilities act (*i.e.,* efficiency, safety, and cost). The coal act also requires Illinois' largest electric plants to include in their clean air act compliance plans the installation of scrubbers to enable them to continue to burn Illinois coal. Once again, this directive does not require that scrubbers ultimately be built or that Illinois coal will continue to be used. Rather, the installation of scrubbers must be considered as an option.

The state argues that the coal act does not burden interstate commerce because it does not mandate that Illinois coal be used. Even though the coal act does not expressly require the use of Illinois coal, the purpose and effect of the coal act is apparent: the coal act clearly protects the interests of the Illinois coal industry. The requirement that utilities and the commission base clean air act compliance decisions—even in part—on the interests of the Illinois coal industry is pure protectionism. It is impossible in any particular case to unravel the commission's decisional process to determine whether the approval of a compliance plan using Illinois coal resulted from the requirements of the coal act. Nevertheless, the overall effect of the coal act certainly is to encourage the use of Illinois coal and to discriminate against out-of-state

---

**6.** The Supreme Court has also found on occasion that "where simple economic protectionism is effected by state legislation, a stricter rule of invalidity has been erected." *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 270, 104 S.Ct. 3049, 3054, 82 L.Ed.2d 200 (1984).

**7.** The preamble to the coal act declares that "the health, welfare and prosperity of all Illinois citizens require" that the use of Illinois coal be taken into account. The state contends that this language is a recommendation, not a command. This contention lacks merit. It is axiomatic that every affirmative command of the Illinois General Assembly is ultimately based on the health and welfare of Illinois' citizens. Although the coal act is expressly based on the health and welfare of Illinois' citizens, it nevertheless is a legislative command. Furthermore, the commission has interpreted the coal act as creating affirmative duties. *See, e.g.,* Approval of Commonwealth Edison Compliance Plan, Alliance Ex. 3 at 2 (the coal act "outlines the factors that the commission must take into account").

coal. By elevating the use of Illinois coal to be a factor that must be considered, the coal act favors Illinois coal producers at the expense of out-of-state producers and protects the Illinois coal industry.

In contending that the coal act does not violate the commerce clause because it does not mandate the use of Illinois coal, the state relies on *Wyoming v. Oklahoma,* —— U.S. ——, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). In the *Wyoming* case, the Supreme Court invalidated an Oklahoma statute requiring local utilities to burn at least 10 percent Oklahoma coal, but did not address the precursor to that statute by which Oklahoma asked instate utilities to "seriously consider" burning Oklahoma coal. *See Wyoming,* —— U.S. at ——, 112 S.Ct. at 794. The state compares the coal act to the earlier Oklahoma statute, arguing that both statutes do not require discriminatory action, but rather only ask utilities to consider the option of using instate coal. The state's position is not convincing. Although the original Oklahoma statute asked electrical generators to consider using Oklahoma coal, those generators had the option of ignoring the statute completely.[8] In contrast, the coal act requires public utilities and the commission to act in a discriminatory fashion in every case. In devising clean air act compliance plans, all public utilities must consider the use of Illinois coal among its matrix of options; the four largest utility plants must include the building of scrubbers among their compliance options, as a way of continuing the use of Illinois coal. In approving proposed clean air act compliance plans, the commission also must consider the use of Illinois coal. Thus, although the commission ultimately may approve a clean air act compliance plan not using Illinois coal, it must, at least in part, base its approval on the interests of the local coal industry.[9]

By requiring public utilities and the commission to consider the use of Illinois coal, the coal act discriminates in favor of the Illinois coal industry. This encouragement for a local industry is anathema to the commerce clause. In *H.P. Hood & Sons, Inc. v. Du Mond,* 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949), the Supreme Court found that a decision by the State of New York not to grant an out-of-state milk distributor a license to expand its facilities was unconstitutional. The Court found that although the out-of-state distributor already was licensed to operate in New York at other facilities, New York's decision not to permit it to expand—in order to protect the in-state milk market—was unlawful protectionism. *See Hood & Sons,* 336 U.S. at 540, 69 S.Ct. at 666. Thus, the Supreme Court did not consider the real-world effects of New York's licensing decision in light of its overt attempt to favor local business.

Similarly, in *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), and *New Energy Co. v. Limbach,* 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988), the Supreme Court ruled that tax credits favoring local industries were invalid under the commerce clause although the real market effects of the tax credits were unclear. In these and numerous other decisions, the Supreme Court has held that legislation that favors in-state industry in any way is repugnant to the commerce clause regardless of discriminatory effects. Under the backdrop of these precedents, it is clear that the coal act advocates the use of Illinois coal—although it does not mandate its use— and creates a discriminatory regime.

The state asserts that the coal act does not favor the use of Illinois coal because the utilities act requires the commission to approve compliance plans that are the least costly to consumers. *See* 220 ILCS 5/1–102.

---

**8.** Apparently a number of those generators did ignore the statute because it was amended three years later to make the use of in-state coal mandatory. *See Wyoming,* —— U.S. at ——, 112 S.Ct. at 794.

**9.** The alliance notes that the three clean air act compliance plans that the commission has approved since the passage of the coal act all favored the use of Illinois coal over switching to out-of-state coal. Alliance Motion at 12–15. These findings are irrelevant for the purposes of the commerce clause. What is relevant is that the commission based its conclusions, *inter alia,* on the need to provide "for the continued use of Illinois coal." *See, e.g.,* Approval of Commonwealth Edison Compliance Plan, Alliance Ex. 3 at 13.

The state argues that regardless of the coal act, the commission may not approve the use of Illinois coal over out-of-state coal unless using Illinois coal would be the cheapest option for ratepayers. The state's argument is belied by logic and by the plain words of the statute.

If the commission always must approve the least costly plan for ratepayers, it is not clear what effect the coal act would ever have. In every case, the commission could consider various factors, but ultimately would be required to base its decision on cost. Thus, the state urges the absurd position that sections of the coal act have no meaning whatsoever. The more plausible reading of the coal act is that the commission must consider and balance various factors, including cost and the importance of using Illinois coal. This conclusion is supported by a close reading of the statute.

The coal act requires the commission and public utilities to:

> ... take into account the need for utilities to comply in a manner which minimizes to the extent consistent with the other goals and objectives of [the utilities act] the impact of compliance on rates for service, the need to use coal mined in Illinois in an environmentally responsible manner in the production of electricity, and the need to maintain and preserve as a valuable State resource the mining of coal in Illinois.

220 ILCS 5/8–402.1(a)(i). The coal act clearly requires that clean air act compliance decisions be made consistently with the overall goals of the utilities act: efficiency, safety, and cost. However, the clause concerning the need to use Illinois coal is set off by commas and is not part of the clause "to the extent consistent with the other goals" of the utilities act. The coal act does not require that the goal of using Illinois coal be subsumed under the goals of efficiency and cost. The use of Illinois coal is a separate factor that public utilities and the commission must

consider wholly apart from the least cost requirement.[10]

For all of the reasons discussed in this section, the coal act favors the Illinois coal industry and discriminates on its face against out-of-state coal interests. The coal act places burdens on interstate commerce.

### b. The coal act is not justified by a legitimate local purpose

In light of the finding that the coal act burdens interstate commerce on its face, the coal act must be found unconstitutional unless the state can justify the coal act "both in terms of local benefits flowing from the statute and the unavailability of nondiscriminatory alternatives adequate to preserve the local interests at stake." *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). The state attempts to justify the coal act as a means of preserving Illinois' coal industry and local economy. The state contends that the Illinois coal industry is at risk, and that all Illinois residents will suffer the consequences of a failure of the coal industry. The state's proposed justification is not legitimate.

The state's attempted justification is based on an essential fallacy that is contained in the coal act itself. The coal act states that the building of scrubbers and the use of:

> Illinois coal as a fuel source can be an environmentally responsible and cost effective means of compliance when the impact on personal income in this State of changing the fuel used at such generating units so as to displace coal mined in Illinois is taken into account.

220 ILCS 5/8–402.1. In describing environmental compliance costs, the coal act conflates the actual costs of clean air act compliance (*e.g.,* the costs of buying low-sulfur coal or the costs of building scrubbers) with the costs to the state's economy if the cheapest means of compliance is to buy out-of-state coal (*e.g.,* the closing of mines and the loss of jobs in Illinois). In attempting to justify the

---

**10.** This reading of the coal act is consistent with the commission's interpretation. The commission approved Commonwealth Edison's compliance plan, finding it to be "the lowest cost alternative for complying with [the 1990 clean air act]

while still providing for the continued use of Illinois coal...." Alliance Ex. 3 at 13. *See also* Approval of Central Illinois Public Service Co., Alliance Ex. 5 at 7 (considering factors of cost and use of Illinois coal separately).

coal act, the state presents the same argument: the coal act is a necessary means of complying with the clean air act as cheaply as possible. In defining cost, the state considers the potential effects to the Illinois economy. Although the state presents its justification in the guise of preservationism and environmental efficiency, its position amounts to naked protectionism.[11]

The state contends that the there are no non-discriminatory measures that could achieve the goals of the coal act. The state cites *Maine v. Taylor*, 477 U.S. 131, 151, 106 S.Ct. 2440, 2454, 91 L.Ed.2d 110 (1986), for the proposition that a state may burden interstate commerce in order to "protect the health and safety of its citizens and the integrity of its natural resources." The state contends that the coal act is a necessary means of preserving the state's economy and resources. The state's position lacks merit. A state may pass a regulatory statute that burdens interstate commerce, but that statute must have a "legitimate local purpose." *Hughes v. Oklahoma* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). The Supreme Court has never found the protection of a state's economy to be a legitimate purpose. Thus, the protection of Illinois' coal industry and economy is not a legitimate local purpose. *See, e.g. Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 272, 104 S.Ct. 3049, 3055, 82 L.Ed.2d 200 (1984) (protection of local industry is not legitimate even if the industry is struggling). The fact that non-discriminatory measures may not adequately protect Illinois' coal industry and economy does not justify simple economic protectionism. A state may not "place itself in a position of economic isolation." *Hughes,* 441 U.S. at 322, 99 S.Ct. at 1729 (citing *Baldwin v. G.A.F. Seelig, Inc.,* 294 U.S. 511, 527, 55 S.Ct. 497, 502, 79 L.Ed. 1032 (1935)). Regardless of the dire economic consequences that the state fears, it may not act as an isolated economic unit apart from its sister states.

### c. Conclusion

 The coal act "discriminates both on its face and in practical effect." *Wyoming v. Oklahoma,* —— U.S. ——, ——, 112 S.Ct. 789, 801, 117 L.Ed.2d 1 (1992). It serves no "legitimate local purpose." *Hughes v. Oklahoma,* 441 U.S. 322, 336, 99 S.Ct. 1727, 1736, 60 L.Ed.2d 250 (1979). The coal act is unconstitutional under the commerce clause. The state is enjoined from enforcing the coal act. In addition, the clean air act compliance plans that the commission has approved in reliance on the coal act are invalid.

### CONCLUSION

For the foregoing reasons, plaintiff the Alliance For Clean Coal's motion for summary judgment is granted. Defendants Ellen Craig, *et al.*'s, motion for summary judgment is denied. The Illinois Coal Act, 220 ILCS 5/8–402.1, is declared repugnant to the commerce clause of the Constitution. The Illinois Commerce Commission is permanently enjoined from enforcing the Illinois Coal Act. Clean Air Act compliance plans that have been prepared and approved in reliance on the Illinois Coal Act are void.

---

11. The state also asserts that the coal act is not discriminatory on its face, but is a permissible attempt to regulate sulfur dioxide emissions more stringently than the minimum levels set by the EPA. In arguing that the coal act is a means of setting more stringent emissions standards, the state contends that the mandatory use of scrubbers is the cheapest means of complying with the clean air act. This argument suffers from the same fallacy: the state's cost calculation considers the effects on Illinois' economy.