**ALLIANCE FOR CLEAN COAL, a Virginia not-for-profit corporation, Plaintiff–Appellee,**

v.

**Dan MILLER, Richard Kolhauser, William M. Dickson, et al.,\* Defendants–Appellants.**

No. 94–1369.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 16, 1994.

Decided Jan. 9, 1995.

---

\* Defendants Miller and Kolhauser are the successors to original defendants Ellen C. Craig and Terrence L. Barnich, who are no longer commissioners of the Illinois Commerce Commission. The remaining five defendants are still commissioners.

R.R. McMahan (argued), Gerald O. Sweeney, Jr., Damon N. Vocke, Lord, Bissell & Brook, Chicago, IL, for Alliance for Clean Coal.

Rosalyn B. Kaplan, Chicago, IL (argued), for Ellen C. Craig, Terrence L. Barnich, William M. Dickson, Ruth K. Kretschmer, Lynn M. Shishido–Topel, David S. Williams.

Rosalyn B. Kaplan, Asst. Atty. Gen., Gail E. Mrozowski, Barbara J. Hillman, Michael H. Holland, Cornfield & Feldman, Chicago, IL, Edgar N. James, Holly B. Fechner, Guerrieri, Edmond & James, Washington, DC, for Karl A. McDermott.

Arend J. Abel, Pamela Carter, Asst. Atty. Gen., Myra P. Spicker, Office of Atty. Gen., Indianapolis, IN, for State of Indiana, amicus curiae.

Joseph B. Meyer, Mary B. Guthrie, Office of Atty. Gen., Cheyenne, WY, for State of Wyoming, amicus curiae.

Joseph P. Mazurek, Clay R. Smith, Office of Atty. Gen., Helena, MT, for State of Montana, amicus curiae.

Before CUMMINGS, CUDAHY and RIPPLE, Circuit Judges.

CUMMINGS, Circuit Judge.

Plaintiff Alliance for Clean Coal ("Alliance") is a Virginia trade association whose members include Colorado and Oregon coal companies and three railroads that transport coal. The defendants are the chairman and six commissioners of the Illinois Commerce Commission in charge of the administration and enforcement of the Illinois Public Utilities Act.

## BACKGROUND

Coal has long been and continues to be the most important source of fuel for the generation of electric power in this country, accounting for 56% of all electricity generated in 1992. Electric utilities, the primary consumers of domestic coal, burned 78% of the 998 million tons of coal produced in the United States in 1992. Coal is produced in over half the states and is sold in a highly competitive national market. See Alliance Ex. 10.

Coal's sulfur content varies greatly depending on its geographical origin. Western coal, mined west of the Rocky Mountains, generally has the lowest sulfur content of any coal produced in the country. Coal mined in the "Illinois Basin," which includes most of Illinois and parts of Indiana and western Kentucky, is relatively high in sulfur. Burning coal emits sulfur dioxide in an amount proportional to the coal's sulfur content. See generally Bruce A. Ackerman & William T. Hassler, *Clean Coal/Dirty Air* (1981).

In the 1970 Amendment to the Clean Air Act, Congress authorized the Environmental Protection Agency ("EPA") to set new standards to regulate various emissions, including sulfur dioxide. See 42 U.S.C. § 7411 (1970) (amended 1977). The EPA provided for two methods to control sulfur dioxide emissions: (1) the use of low sulfur coal; and (2) the use of pollution control devices ("scrubbers").

In 1977 Congress again amended the Clean Air Act, requiring new electric plants to build scrubbers. By requiring scrubbers regardless of the sulfur content of the coal burned, Congress essentially eliminated for new facilities the low-sulfur coal compliance option that had been available under the 1970 Amendment.

In 1990 Congress once again amended the Act, this time requiring a drastic two-stage reduction in industrial sulfur dioxide emissions in an attempt to combat acid rain. The 1990 Act implements a market-driven approach to emissions regulation, allowing for the free transfer of emission "allowances." The Act is aimed at reducing sulfur dioxide emissions in the most efficient manner and, like the 1970 Act, allows electric generating plants to meet the emission standards in the cheapest way possible. The principal methods of compliance now include installing new scrubbers, using low-sulfur coal, switching to another fuel source, or buying additional emission allowances.

The 1990 amendments meant the end of the salad days for high-sulfur coal-producing states such as Illinois. Low-sulfur western coal once again offered a viable alternative to the continued burning of high-sulfur coal combined with the installation of expensive new scrubbers. Faced with potentially damaging competition for the local coal industry, in 1991 the Illinois General Assembly passed the Coal Act, an addition to the Utilities Act, concerning implementation and compliance with the 1990 Clean Air Act amendments. See 220 ILCS 5/8–402.1. Under the Coal Act, utilities must formulate Clean Air Act compliance plans which must be approved by the Illinois Commerce Commission. In preparing and approving these compliance plans, the utilities and the Commerce Commission are required to:

take into account the need for utilities to comply in a manner which minimizes to the extent consistent with the other goals and objectives of this Section the impact of compliance on rates for service, the need to use coal mined in Illinois in an environmentally responsible manner in the production of electricity and the need to main-

tain and preserve as a valuable State resource the mining of coal in Illinois.

220 ILCS 5/8–402.1(a). The Act encourages the installation of scrubbers to allow the continued burning of Illinois coal, stating that the combination

> can be an environmentally responsible and cost effective means of compliance when the impact on personal income in this State of changing the fuel used at such generating plants so as to displace coal mined in Illinois is taken into account.

*Id.* The four largest generating plants in Illinois currently burning Illinois coal are required to include the installation of scrubbers in their compliance plans so that they will be able to continue their use of Illinois coal. The cost of these scrubbers will be deemed "used and useful" when placed in operation and the utilities are guaranteed that they will be able to include the costs in their rate base. The Act further provides that the Commerce Commission must approve any 10% or greater decrease in the use of Illinois coal by a utility.

Plaintiff asked the district court to declare the Illinois Coal Act repugnant to the Commerce Clause of the federal Constitution and to enjoin its enforcement. In December 1993, District Judge Conlon handed down a memorandum opinion and order granting such relief. *Alliance for Clean Coal v. Craig,* 840 F.Supp. 554 (N.D.Ill.1993). The court enjoined the Illinois Commerce Commission from enforcing the Illinois Coal Act and voided federal Clean Air Act compliance plans approved in reliance on the Illinois Coal Act.

On appeal, the defendant commissioners request that we dismiss the case for want of jurisdiction or, if we reach the merits, reverse the judgment below.

*Jurisdiction*

■ The Illinois commissioners assert that the federal courts lack jurisdiction to resolve this dispute. They claim that there exists no "case or controversy" because plaintiff Alliance has no standing to seek the requested relief having suffered no "injury in fact." The district court did not discuss this question since it was not raised below. Because

jurisdiction is a *sine qua non,* we will discuss this argument.

■ While admitting that Alliance members "have done or are doing some degree of business with Illinois utilities," Illinois argues that Alliance has not established that it has suffered an "injury in fact" because "they do not identify any business overtures that were made and rebuffed on the basis of [the Coal Act]." But the showing of specific "lost opportunities" is neither required to establish standing nor reasonably expected under the circumstances of this case. An "injury in fact" is "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical'." *Lujan v. Defenders of Wildlife,* —— U.S. ——, ——, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351. The Illinois Coal Act allegedly impinges on Alliance's members' rights to compete on an equal footing in interstate commerce. This injury is particular to suppliers and others who deal or are attempting to sell western coal to Illinois utilities. Despite the absence of evidence of specific lost deals, this competitive injury is neither "conjectural" nor "hypothetical"—the injury is not a particular lost sale but the "inability to compete on an equal footing." *Northeastern Florida Contractors v. Jacksonville,* —— U.S. ——, ——, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586; *Government Suppliers Consolidating Services v. Bayh,* 975 F.2d 1267, 1274–75 (7th Cir.1992), certiorari denied, —— U.S. ——, 113 S.Ct. 977, 122 L.Ed.2d 131; *Mapco, Inc. v. Grunder,* 470 F.Supp. 401, 403–06 (N.D.Ohio 1979) (Article III standing exists under similar allegations).

Moreover, because the alleged discrimination against western coal occurs at the very early stage in the utilities' drafting of compliance plans and the Commerce Commission's actions with respect to those plans, it is unreasonable to expect Alliance to point to specific orders canceled or deals reneged on. Any specific supply arrangements would occur much farther down the road after a compliance plan had been adopted and approved. Plaintiff's alleged injury is that because of the challenged legislation, such

plans will be less likely to include the use of western coal.

As further "evidence" that Alliance has not suffered an injury in fact, Illinois asserts that the sale of western coal to Illinois utilities has actually increased since the 1991 passing of the Coal Act. The 1990 Clean Air Act opened up the Illinois market for western coal by once again allowing the use of low-sulfur coal as a compliance option. It is therefore not surprising that the sale of western coal has increased despite the best efforts of the Illinois legislature. The alleged injury stems from the fact that sales have not increased as much or as rapidly as they would have on a level playing field without the Coal Act. Finally, it is difficult to imagine more appropriate plaintiffs to challenge the constitutionality of the Illinois Act. Sellers of out-of-state coal were the ideal plaintiffs missing in *Wyoming v. Oklahoma.* See *Wyoming v. Oklahoma,* 502 U.S. 437, 461–62, 112 S.Ct. 789, 804, 117 L.Ed.2d 1 (Justice Scalia, joined in dissent by Chief Justice Rehnquist and Justice Thomas, implied that Wyoming does not have standing but that sellers of coal from Wyoming would).

### Constitutionality of Illinois Coal Act

■ Alliance attacks the constitutionality of the Illinois Coal Act under the Commerce Clause of the Constitution. That clause provides that "the Congress shall have power ... to regulate commerce ... among the several states." Article I, Section 8, Clause 3. It has long been interpreted to have a "negative" aspect that denies the states the power to discriminate against or burden the interstate flow of articles of commerce. *E.g., Welton v. Missouri,* 91 U.S. (1 Otto) 275, 23 L.Ed. 347; *Wyoming v. Oklahoma,* 502 U.S. 437, 454–55, 112 S.Ct. 789, 800, 117 L.Ed.2d 1. "[I]f a statute discriminates against interstate commerce either on its face or in its practical effect, it is subject to the strictest scrutiny ... '[W]here simple economic protectionism is effected by state legislation, a virtual *per se* rule of invalidity has been erected.'" *DeHart v. Town of Austin,* 39

F.3d 718, 723 (7th Cir.1994), quoting *Philadelphia v. New Jersey,* 437 U.S. 617, 624, 98 S.Ct. 2531, 2535, 57 L.Ed.2d 475.

Two recent Supreme Court cases interpreting the negative Commerce Clause are controlling here. In *Oregon Waste Systems v. Department of Environmental Quality,* —— U.S. ——, 114 S.Ct. 1345, 128 L.Ed.2d 13, the Court held that the negative Commerce Clause prohibited a state surcharge on the disposal of solid waste generated out of state. In *West Lynn Creamery, Inc. v. Healy,* —— U.S. ——, 114 S.Ct. 2205, 129 L.Ed.2d 157, the Court struck down a Massachusetts milk-pricing order which employed a tax on all milk sold to fund a subsidy to instate producers.[1] Because the Illinois Coal Act, like the milk-pricing order in *West Lynn,* has the same effect as a "tariff or customs duty—neutralizing the advantage possessed by lower cost out of state producers," it too is repugnant to the Commerce Clause and the principle of a unitary national economy which that clause was intended to establish. *West Lynn,* —— U.S. at ——, 114 S.Ct. at 2212.

The Illinois Coal Act is a none-too-subtle attempt to prevent Illinois electric utilities from switching to low-sulfur western coal as a Clean Air Act compliance option. Indeed, the statute itself states that the Illinois General Assembly determined that there was "the need to use coal mined in Illinois" and "the need to maintain and preserve as a valuable State resource the mining of coal in Illinois." 220 ILCS 5/8–402.1(a). The Act implements this protectionist policy in four ways. First, it tilts the overall playing field by requiring that commissioners take account of the effect on the local coal industry when considering compliance plans. *Id.* Second, the Act requires that certain large generating units install scrubbers "to enable them to continue to burn Illinois coal." 220 ILCS 5/8–402.1(e). Third, the Act guarantees that the cost of these scrubbers can be included in the utility's rate base and passed through to consumers, even where the use of low-sulfur

---

1. The history of the Commerce Clause is thoroughly covered in the *West Lynn Creamery* opinion and need not be repeated here, nor is it necessary to cite the litany of supporting cases cited there as well as in *Oregon Waste Systems.*

western coal would be a cheaper compliance option. 220 ILCS 5/8–402.1(e) and 220 ILCS 5/9–212. Finally, the Act requires Commerce Commission approval before a utility can make a change in fuel that would result in a 10% or greater decrease in the utility's use of Illinois coal. In determining whether to grant approval, the Commerce Commission "shall consider the impact on employment related to the production of coal in Illinois." 220 ILCS 5/8–508. The intended effect of these provisions is to foreclose the use of low-sulfur western coal by Illinois utilities as a means of complying with the Clean Air Act. This of course amounts to discriminatory state action forbidden by the Commerce Clause.

■ Illinois seeks to save the Act by claiming that it merely "encourages" the local coal industry and does not in fact discriminate. This argument rings hollow. The Illinois Coal Act cannot continue to exist merely because it does not facially compel the use of Illinois coal or forbid the use of out-of-state coal. As recognized in *West Lynn Creamery*, even ingenious discrimination is forbidden by the Commerce Clause. — U.S. at ——, 114 S.Ct. at 2215. By "encouraging" the use of Illinois coal, the Act discriminates against western coal by making it a less viable compliance option for Illinois generating plants. Moreover, the requirement that certain generators be equipped with scrubbers essentially mandates that these generators burn Illinois coal: that is the purpose of the scrubber requirement, and the Commerce Commission would likely not allow the pass-through of the then-unnecessary additional cost of low-sulfur western coal. Such a mandate runs directly afoul of *Wyoming v. Oklahoma*, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (requirement that Oklahoma generating plants burn 10% Oklahoma coal held to violate the Commerce Clause). Similarly, the guaranteed pass-through of the scrubber cost to rate-payers is equivalent to the minimum price fixing for the benefit of local producers held unconstitutional in *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 55 S.Ct. 497, 79 L.Ed. 1032.

Illinois argues that it has merely "agreed to 'subsidize' the cost of generating electrici-ty through the use of Illinois coal by requiring its own citizens to bear the cost of pollution control devices." First, the fact that Illinois rate-payers are footing the bill does not cure the discriminatory impact on western coal producers. As the Supreme Court noted in rejecting an identical argument in *West Lynn*, "[t]he cost of a tariff is also borne primarily by local consumers yet a tariff is the paradigmatic Commerce Clause violation." *West Lynn*, — U.S. at —— ——, 114 S.Ct. at 2216–2217. Second, Illinois' characterization of the Act as an "agreement to subsidize" does not suffice to fit this case into the "market participant" exception to the negative Commerce Clause created in *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220. Illinois is not acting as a purchaser of either coal or electricity but as a regulator of utilities. The fact that its regulatory action "has the purpose and effect of subsidizing a particular industry ... does not transform it into a form of state participation in the free market." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 277, 108 S.Ct. 1803, 1809, 100 L.Ed.2d 302 (state tax credit for the use of Ohio-produced ethanol violated the Commerce Clause).

Finally, defendants champion the Illinois Coal Act as a means of protecting Illinois and its citizens from economic harm that would result from a decline in the local coal industry. Such concerns do not justify discrimination against out-of-state producers. "Preservation of local industry by protecting it from the rigors of interstate competition is the hallmark of economic protection that the Commerce Clause prohibits." *West Lynn*, — U.S. at ——, 114 S.Ct. at 2217.

The purpose of the Illinois Coal Act was "to maintain and preserve ... the mining of coal in Illinois" and to continue "to use Illinois coal as a fuel source." 220 ILCS 5/8–402.1(a). The Illinois Commerce Commission was required to take into account "the need to use coal mined in Illinois." *Id.* The obvious intent was to eliminate western coal use by Illinois generating plants, thus effectively discriminating against western coal. The Commerce Clause compels us to invali-

date this statute, and consequently the compliance plans thereunder.

Judgment affirmed.[2]

CUDAHY, Circuit Judge, concurring.

Although the framework provided by the majority opinion is supportable, I believe that it is incomplete and, at the same time, may overstate the case. When all the conflicting considerations are weighed, there is some basis for concluding that Illinois has crossed the constitutional line, but its actions are probably only the first in a series of efforts to accommodate conflicting but important and legitimate public policies.

On the issue of standing, this is also a close case. Use of Western coal in Illinois is on the rise, Appellant Reply Br. at 3, and the requisite showing of injury here is elusive. The best argument for standing is that there will be no other plaintiffs with a basis for challenging the Coal Act if the plaintiffs presently before us are denied a right to proceed. But for that reason alone, if for no other, I am prepared to address the merits since early determination will preclude equities from vesting in reliance on the Coal Act when its constitutionality remains in doubt.

The parties take issue starkly on the question whether a state may "encourage" local industry by indirect means. What is in part at issue is a form of state subsidy for the installation of "scrubbers"—a pollution abatement technology for dealing with the sulfur contained in coal. The Coal Act guarantees that the ratepayers will pay in their rates for the capital and operating costs of scrubbers, which the Act in effect mandates in certain cases. The ratepayers are substantially coterminous with the taxpayers and a mandate to place a charge on the ratepayers is in economic effect functionally equivalent to a subsidy financed from general revenues.

But does every form of "subsidy" to local industry violate the Commerce Clause? The State cites *Hughes v. Alexandria Scrap Corp.*, 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976) (Stevens, J. concurring) as supporting such an approach in appropriate circumstances. *See also Reeves Inc. v. Stake*, 447 U.S. 429, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980); *W.C.M. Window Co. v. Bernardi*, 730 F.2d 486, 494 (7th Cir.1984) (if "the State of Illinois subsidized the electrical generating plants in Illinois that buy coal, it could, without violating the commerce clause, forbid them to buy coal produced out of state.") In *Hughes*, the Supreme Court upheld a Maryland cash subsidy program which discriminated in favor of in-state auto hulk processors because the Court found the State's action to be analogous to that of a private purchaser of auto hulks, and therefore characterized the State as engaging in proprietary rather than regulatory activity. However, this exception to the dormant Commerce Clause, the market participant doctrine, restricts permissible subsidies to situations where a state is "acting in the more general capacity of a market participant" rather than "in its distinctive governmental capacity." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 277, 108 S.Ct. 1803, 1809, 100 L.Ed.2d 302 (1988). Further, since first enunciated in *Hughes*, the market participant doctrine has been narrowed to exclude many state actions that appear to be "subsidy equivalents." *See, e.g., Wyoming v. Oklahoma*, 502 U.S. 437, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992) (requiring ten percent use of in-state coal is unconstitutional under the Commerce Clause); *New Energy*, 486 U.S. at 277, 108 S.Ct. at 1809 (state tax credit for ethanol produced in-state violates the Commerce Clause because State's action in assessing and computing fuel sales tax does not make State into private purchaser, even if it does produce a subsidy); *Bacchus Imports Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) (Hawaii tax-exemption for special wines produced only in Hawaii constituted violation of the Commerce Clause); *South–Central Timber Dev. v. Wunnicke*, 467 U.S. 82, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (State requirement that purchasers of Alaskan timber have the timber processed in Alaska violates the

2. Montana and Wyoming have submitted an amicus brief in support of affirmance while the *amicus* brief of Indiana favors reversal.

Commerce Clause, even though the State was the seller of the timber). Therefore, even assuming that the mandated rate base treatment of the scrubbers is the functional equivalent to a subsidy, its constitutionality remains in question.

But this attempt to analyze the matter as a subsidy takes place in a factual vacuum since there has been no showing that Western coal (which has lower B.T.U. (caloric) content and carries heavy transportation charges) is cheaper than Illinois coal including the cost of processing by scrubbers. One might surmise that the price of Western coal is limited by the price of Eastern coal plus scrubbers, but there is nothing in this record on the subject. Therefore, it is impossible to know with certainty whether a guarantee of rate base treatment for scrubbers confers a real benefit or not. After all, if there were no reason in any event to exclude scrubbers from rate base, a prior legislative guarantee of rate base treatment would be of slight value. For present purposes, however, we may treat the guarantee as a benefit in the abstract, possibly useful in some cases but not at all in others. It is not helpful to the analysis, though, that there are no actual price relationships before us.

The State's most effective argument is that we are dealing with a local (retail) ratemaking and electric operations problem over which the states have plenary authority. Appellants Br. at 33; see Arkansas Elec. Coop. v. Arkansas Public Serv. Comm'n, 461 U.S. 375, 395, 103 S.Ct. 1905, 1918, 76 L.Ed.2d 1 (1983) (replacing the bright line distinction between state regulation of retail versus wholesale electricity sales with the balancing test of modern Commerce Clause jurisprudence, but reaffirming the general premise of "leaving regulation of retail utility rates largely to the States.") The basic principle under the Coal Act (as elsewhere) for the conduct of electric operations is to arrive at the "least cost" solution. The State argues, in accordance with unimpeachable economic theory, that "cost" means "social cost" and should include the cost of providing compensation for the sectors of society suffering injury from the lost Illinois coal business (such as the cost of unemployment compensation and loss of tax revenue). This is an "externality" not incorporated in ordinary commercial calculations but is a real cost to society nonetheless.

The answer to this argument seems to be that this is an externality that the states may not recognize since the Commerce Clause effectively precludes consideration of local economic damage as a legitimate reason to handicap interstate commerce. Wyoming, 502 U.S. at 454–55, 112 S.Ct. at 800 ("When the state statute amounts to simple economic protectionism, a virtually per se rule of invalidity has applied."). Another way of handling this problem would be to offset the externality of damage to the Illinois coal industry with the additional externality of the long-term benefit accruing to Illinois from the free trade bias of the Constitution. In any event, the external cost of damage to the Illinois coal industry is something that presumably may not be recognized in computation of "least cost" for present purposes.

Nonetheless, the assurance of rate base treatment for scrubbers (which provide a capability for using Illinois coal) seems a tenuous basis for finding a violation of the Commerce Clause. I believe no Supreme Court case goes so far as clearly to support the conclusion that this is a violation although the trend of the Court's decisions may point this far. (See discussion above of Wyoming, 502 U.S. 437, 112 S.Ct. 789; New Energy, 486 U.S. 269, 108 S.Ct. 1803; Bacchus Imports, 468 U.S. 263, 82 L.Ed.2d 200). It is difficult to perceive the realities here since, as discussed above, we do not know the price and cost relationships involved and, in addition, it is hard to know how far this statute takes us beyond the already existing commercial and regulatory biases.

In this connection, I assume that both the utilities and the I.C.C. may have reason to favor Illinois coal even without this legislation. The utilities are pervasively state-regulated and simply as a matter of political prudence one would expect them to be more sensitive to major Illinois political and economic interests—like the coal industry and the labor it employs—than to the needs of the same interests in Wyoming or Montana. Similarly, the members of the I.C.C. are appointed by a Governor dependent for votes on Illinois' coal-producing areas. One would

not expect them to be hard at work furthering the aims of out-of-state mines or railroads. The mandates of the Coal Act may bring a local bias into more focus, but I doubt that they bring about a fundamental shift in preference.

With respect to constitutional vulnerability it seems to me that the requirement that utilities get permission from the I.C.C. for any change that causes their use of Illinois coal to drop by ten percent or more is much more questionable than the rate base treatment of scrubbers or the injunction to consider the local coal industry as part of a determination of least cost. *Cf. Wyoming*, 502 U.S. 437, 112 S.Ct. 789.

I am also inclined to consider this legislation as possibly vulnerable under the Supremacy Clause. In contrast to the 1978 law, when Congress ordered scrubbers for all new coal plants, in 1990 it presumably adopted a "market-driven" view.[1] This approach is much in vogue currently,[2] and it is at least plausible that Congress in 1990 would have accepted this characterization. Over the years, the scrubber problem has been hotly debated and in 1978 the Eastern coal interests and coal mine labor succeeded in securing a mandate for scrubbers. As indicated, in 1990 there seems to have been a disposition to leave the matter to the markets. It might be argued that Congress intended to "occupy the field" with a market-based approach, eschewing any mandatory measures. If this were the case, any "putting of thumbs on the scale" by the states might be preempted by the prescribed market-oriented methodology. The relevant

Court cases, however, seem to make much easier the striking down of state legislation on Commerce Clause grounds, where relatively little burden or interstate commerce need be shown, than on grounds of preemption, where the requirements seem quite exacting. *See English v. General Electric Co.*, 496 U.S. 72, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990); *Pacific Gas and Electric*, 461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752.

These somewhat inconsistent considerations seem to create a conundrum in the case before us, whatever the standard for striking down state "encouragement" to local industry. In the end, I join, but with significant reservations, in the result reached by the majority opinion.

---

1. *See, e.g.*, Alexander F. Skirpan, *Plus Ca Change, Plus C'Est La Meme Chose: 1990 Amendments to the Clean Air Act and Their Impact on Utility Regulation*, 55 U.Pitt.L.Rev. 171, 202, 204 (1993) (discussing, in part, the least-cost, free-market approach of the Clean Air Act Amendments).

2. Perhaps the most well known example is the deregulation of the airline industry, see Stephen G. Breyer, *Regulation and Its Reform*, chs. 11, 16 (1982), but public utility and environmental regulation are two other areas that have also seen important changes in thinking. *See, e.g.*, George R. Hall, *The Emerging Standard for Market–Based Wholesale Electric Rates*, 128 No. 6 Pub.Util.Fort. 19 (Sept. 15, 1991) (in recent years Federal Energy Regulatory Commission has moved to determining just and reasonable rates by "market-based" system); Jerold S. Kayden, *Market–Based*

*Regulatory Approaches: A Comparative Discussion of Environmental and Land Use Techniques in the United States*, 19 B.C.Envtl.Aff.L.Rev. 565 (1992) (United States national and state environmental policy is moving to market-based regulatory strategies); G. William Stafford, *Electric Wholesale Power Sales at Market–Based Rates*, 12 Energy L.J. 291 (1991) ("The growing influence of market-based pricing is evidenced by the increasing number of proposals that have come before the [Federal Energy Regulatory] Commission for the sale of power where market-based pricing considerations are reflected and by the Commission's efforts to examine significant issues ... [of] market-based rates and ... services."). *Cf.* Richard D. Cudahy, *Retail Wheeling: Is this Revolution Necessary?*, 15 Energy L.J. 351 (1994).