# IN THE SUPREME COURT OF IOWA

No. 10–2080

Filed June 8, 2012

**NEXTERA ENERGY RESOURCES LLC,**

    Appellant,

vs.

**IOWA UTILITIES BOARD,**

    Appellee,

**MIDAMERICAN ENERGY COMPANY** and
**OFFICE OF CONSUMER ADVOCATE,**

    Intervenors-Appellees.

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg, Judge.

An energy company appeals a district court decision affirming the Iowa Utility Board's decision to grant advance ratemaking principles to a regulated utility. **AFFIRMED**

Bret A. Dublinske of Gonzalez Saggio & Harlan LLP, West Des Moines, Victoria J. Place, Des Moines, and Peter L. Gardon and Bryan K. Nowicki of Reinhart Boerner Van Deuren S.C., Madison, Wisconsin, for appellant.

David J. Lynch and Gary D. Stump, Des Moines, for appellee Iowa Utilities Board.

Steven L. Nelson of Davis, Brown, Koehn, Shors & Roberts, P.C., Des Moines, and Steven R. Weiss and Charles R. Montgomery, Urbandale, for appellee MidAmerican Energy Company.

Mark R. Schuling and Ronald C. Polle, Des Moines, for appellee Office of Consumer Advocate.

**WIGGINS, Justice.**

NextEra Energy Resources, LLC, appeals the Iowa Utility Board's decision to grant advance ratemaking principles to MidAmerican Energy Company for the Wind VII Iowa Project, a proposed wind generation facility. NextEra raises issues pertaining to the Board's interpretation of Iowa Code section 476.53 (2009), whether substantial evidence supported the Board's findings, the applicability of section 476.43 to the ratemaking proceeding, and section 476.53's constitutionality as applied to a rate-regulated public utility that may compete in the wholesale energy market. After the Board approved MidAmerican's application, NextEra sought judicial review of that decision. The district court affirmed the Board.

On appeal, we find (1) the Board properly interpreted and applied section 476.53, (2) substantial evidence supported the Board's findings, (3) section 476.43 is not applicable to this ratemaking proceeding, and (4) section 476.53 as applied to a rate-regulated public utility that may compete in the wholesale energy market does not violate the Equal Protection Clauses of the Iowa or United States Constitutions or the Commerce Clause of the United States Constitution. Accordingly, we affirm the judgment of the district court affirming the judgment of the Board.

## I. Background Facts and Proceedings.

On March 25, 2009, MidAmerican filed an application with the Board for advance ratemaking principles for Wind VII, a project involving the generation of up to 1001 megawatts of wind energy. MidAmerican is a rate-regulated utility subject to the Board's regulatory authority pursuant to chapter 476 of the Iowa Code. MidAmerican is obligated to serve all retail electric customers in its exclusive service territory and

sells excess power in the wholesale market subject to the Board's regulations. Prior to its application for ratemaking principles for Wind VII, MidAmerican sought and received ratemaking principles for six wind generation projects ranging from 50 to 540 megawatts.

Before filing its application, MidAmerican entered into a stipulation and agreement with the Office of Consumer Advocate. The agreement, which accompanied MidAmerican's application, addressed twelve ratemaking principles. It also stipulated MidAmerican had met the conditions precedent for receiving ratemaking principles.

MidAmerican stated numerous reasons for pursuing Wind VII. In particular, MidAmerican stated the following reasons underlie its decision to expand its wind power generating capacity: (1) the State's encouragement of the generation of renewable energy; (2) positive experiences with its own existing wind projects; (3) timing and economics that are advantageous for MidAmerican's customers; (4) soft market conditions, which allow MidAmerican to obtain reasonably priced turbines; (5) a projection that Wind VII will essentially pay for itself over its twenty-year depreciable life, mitigating the need to increase rates in the future; (6) an increased likelihood that Congress will enact carbon legislation, making wind power more valuable to MidAmerican's customers; and (7) its desire to further increase fuel diversity.

On April 17, NextEra filed a petition to intervene and objected to the stipulation and agreement, arguing the Board should not award advance ratemaking principles to MidAmerican for Wind VII.[1] NextEra is an independent wholesale energy producer that sells electricity in the wholesale market. It is North America's largest producer of wind energy

---

[1]Iberdrola Renewables, Inc., and Interstate Power and Light Company also intervened; however, neither sought judicial review of the Board's decision.

and, in August 2009, owned sixty-five wind facilities in the United States and Canada, including facilities in Iowa. Because it is an independent energy producer, chapter 476 does not apply to NextEra, the Board does not regulate NextEra, and NextEra does not have an obligation to serve retail customers.

NextEra believes that MidAmerican is pursuing Wind VII solely as a vehicle to increase MidAmerican's presence in the wholesale energy market and that the awarding of ratemaking principles would give MidAmerican a competitive advantage in the wholesale market. NextEra believes the award of ratemaking principles for Wind VII would impose risks on MidAmerican's ratepayers that should instead be borne by its shareholders. Further, NextEra would like to sell renewable energy to MidAmerican, either through a purchase power agreement or by developing and selling a wind farm to MidAmerican.

The Board granted advance ratemaking principles for Wind VII to MidAmerican. NextEra timely filed a petition for judicial review. The district court affirmed the Board's decision. NextEra appeals. Additional background facts and proceedings will be set out below as they relate to each issue.

**II. Issues.**

NextEra presents the following issues for review: (1) whether the Board incorrectly applied the "need" requirement of section 476.53; (2) whether the Board failed to require MidAmerican to compare Wind VII with other feasible alternatives as required by section 476.53(4)(*c*)(2); (3) whether the Board's decision to grant advance ratemaking principles to NextEra was supported by substantial evidence; (4) whether the Board erred in determining section 476.43 did not apply to MidAmerican's application for advance ratemaking principles for Wind VII; (5) whether

section 476.53, as applied to a rate-regulated utility that may compete in the wholesale energy market, violates the equal protection guarantees of the United States or Iowa Constitutions; and (6) whether section 476.53, as applied to a rate-regulated utility that may compete in the wholesale energy market, violates the Commerce Clause of the United States Constitution.

### III. Interpretation of the "Need" Requirement of Section 476.53.

When a rate-regulated public utility files an application to construct a wind energy generating facility, Iowa Code section 476.53 requires the Board to specify in advance the ratemaking principles that will apply when the costs of the facility are included in regulated electric rates. Iowa Code § 476.53(4)(*a*)(1). Before the Board may determine the applicable ratemaking principles, section 476.53(4) requires the Board to find that "[t]he rate-regulated public utility has demonstrated to the board that the public utility has considered other sources for long-term electric supply and that the facility . . . is reasonable when compared to other feasible alternative sources of supply." *Id.* § 476.53(4)(*c*)(2). Section 476.53(4) then contemplates that the utility may satisfy this requirement "through a competitive bidding process, under rules adopted by the board, which demonstrate the facility . . . is a reasonable alternative to meet its electric supply needs." *Id.* NextEra argues the Board incorrectly applied this "need" requirement.

**A. Scope of Review.** Iowa Code section 17A.19(10) governs judicial review of administrative agency decisions. *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 589 (Iowa 2004). To decide this issue we must interpret section 476.53. To determine the applicable standard of review of an agency's interpretation of a statute, we must determine

whether the legislature clearly vested the agency with the authority to interpret the statute at issue. *Doe v. Iowa Dep't of Human Servs.*, 786 N.W.2d 853, 857 (Iowa 2010). If the legislature clearly vested the agency with the authority to interpret specific terms of a statute, then we defer to the agency's interpretation of the statute and may only reverse if the interpretation is "irrational, illogical, or wholly unjustifiable." *Id.*; *accord Renda v. Iowa Civil Rights Comm'n*, 784 N.W.2d 8, 10 (Iowa 2010); *see also* Iowa Code § 17A.19(10)(*l*). If, however, the legislature did not clearly vest the agency with the authority to interpret the statute, then our review is for correction of errors at law. *Doe*, 786 N.W.2d at 857; *see also* Iowa Code § 17A.19(10)(*c*).

When making this determination, we look carefully "at the specific language the agency has interpreted as well as the specific duties and authority given to the agency with respect to enforcing particular statutes." *Renda*, 784 N.W.2d at 13. Although "[t]he legislature may explicitly vest the authority to interpret an entire statutory scheme with an agency[,] . . . the fact that an agency has been granted rule making authority does not 'give[] an agency the authority to interpret *all* statutory language.' " *Evercom Sys., Inc. v. Iowa Utils. Bd.*, 805 N.W.2d 758, 762 (Iowa 2011) (quoting *Renda*, 784 N.W.2d at 13). Furthermore, "broad articulations of an agency's authority, or lack of authority, should be avoided in the absence of an express grant of broad interpretive authority." *Renda*, 784 N.W.2d at 14.

Certain guidelines have emerged to help us determine whether the legislature clearly vested interpretative authority in the agency, two of which are relevant here. *Id.* First, "when the statutory provision being interpreted is a substantive term within the special expertise of the agency, . . . the agency has been vested with the authority to interpret

the provisions." *Id.* Second, "[w]hen a term has an independent legal definition that is not uniquely within the subject matter expertise of the agency, we generally conclude the agency has not been vested with interpretative authority." *Id.* In sum, in order for us to find the legislature clearly vested the Board with authority to interpret section 476.53, we

> must have a firm conviction from reviewing the precise language of the statute, its context, the purpose of the statute, and the practical considerations involved, that the legislature actually intended (or would have intended had it thought about the question) to delegate to the agency interpretive power with the binding force of law over the elaboration of the provision in question.

*Doe*, 786 N.W.2d at 857 (citation and internal quotation marks omitted).

Accordingly, we must determine whether the general assembly explicitly vested the Board with the authority to interpret specific terms in chapter 476. In the first section of chapter 476, the general assembly granted the Board authority to "regulate the rates and services of public utilities to the extent and in the manner hereinafter provided." Iowa Code § 476.1. The general assembly also granted the Board broad general powers to carry out the purposes of chapter 476. *Id.* § 476.2(1). Section 476.2(1) states:

> The board shall have broad general powers to effect the purposes of this chapter notwithstanding the fact that certain specific powers are hereinafter set forth. The board shall have authority to issue subpoenas and to pay the same fees and mileage as are payable to witnesses in the courts of record of general jurisdiction and shall establish all needful, just and reasonable rules, not inconsistent with law, to govern the exercise of its powers and duties, the practice and procedure before it, and to govern the form, contents and filing of reports, documents and other papers provided for in this chapter or in the board's rules. In the establishment, amendment, alteration or repeal of any of such rules, the board shall be subject to the provisions of chapter 17A.

*Id.* However, simply because the general assembly granted the Board broad general powers to carry out the purposes of chapter 476 and granted it rulemaking authority does not necessarily indicate the legislature clearly vested authority in the Board to interpret all of chapter 476.

In granting the Board rulemaking authority, the general assembly used the following language: "The Board . . . shall establish all needful, just and reasonable rules . . . to govern the exercise of its powers and duties." *Id.* § 476.2(1). While "govern" means, "to exercise arbitrarily or by established rules continuous sovereign authority over," it also means "to rule without sovereign power." *Webster's Third New International Dictionary* 982 (unabr. ed. 2002). This second definition is synonymous with implementing or administering. *See id.* "Exercise" means "the discharge of an official function or professional occupation." *Id.* at 795.

From these definitions, we can draw two possible conclusions. The general assembly may have intended that the Board exercise sovereign authority in discharging its official function of effecting the purposes of chapter 476. However, the general assembly may also have intended that the Board merely implement or administer the laws contained in chapter 476 without sovereign authority. Furthermore, the general assembly expressly subjected the Board to chapter 17A, the Iowa Administrative Procedure Act, which specifically provides for "legislative oversight of powers and duties delegated to administrative agencies." Iowa Code § 17A.1(3). Therefore, because of the ambiguous definition of "govern" and the express reference to chapter 17A, we conclude under *Renda* that the general assembly did not delegate to the Board interpretive power with the binding force of law. Accordingly, we will

examine the Board's interpretation of section 476.53(4)(*c*)(2) for correction of errors at law. *Id.* § 17A.19(10)(*c*).

**B. Interpretation of Section 476.53.** NextEra claims the "electric supply needs" language in section 476.53(4)(*c*)(2) requires the Board to determine Iowa ratepayers need the electrical supply the proposed project will generate before it can grant an order specifying advance ratemaking principles. After conceding MidAmerican did not have an immediate need for additional wind energy capacity, the Board interpreted section 476.53(4)(*c*)(2)'s "need" requirement to be broader than alleged by NextEra. The Board concluded the "need" requirement not only includes present capacity, but that it also includes needs based on compliance with present and future environmental regulations, fuel diversity, the supply of less expensive energy to its consumers, and the promotion of economic development and Iowa's energy policy. The Board stated consideration of these needs demonstrated MidAmerican's compliance with its statutory obligation to plan prudently to provide reasonable and adequate service to its retail customers at just and reasonable rates.

In 2009, section 476.53 provided in relevant part:

> 1. It is the intent of the general assembly to attract the development of electric power generating and transmission facilities within the state in sufficient quantity to ensure reliable electric service to Iowa consumers and provide economic benefits to the state.

> 2. The general assembly's intent with regard to the development of electric power generating and transmission facilities, as provided in subsection 1, shall be implemented in a manner that is cost-effective and compatible with the environmental policies of the state, as expressed in Title XI.

*Id.* § 476.53(1)–(2).

While this case was on judicial review, the general assembly passed a bill amending subsections (1) and (2) of section 476.53, which the governor subsequently signed into law. 2010 Iowa Acts ch. 1176 § 2 (codified at Iowa Code § 476.53(1)–(2) (2011)). The general assembly added the following intent language to subsection (1): "It is also the intent of the general assembly to encourage rate-regulated public utilities to consider altering existing electric generating facilities, where reasonable, to manage carbon emission intensity in order to facilitate the transition to a carbon-constrained environment." *Id.*

Further, the general assembly amended subsection (2) by adding the following language:

> *b.* The general assembly's intent with regard to the reliability of electric service to Iowa consumers, as provided in subsection 1, shall be implemented by considering the diversity of the types of fuel used to generate electricity, the availability and reliability of fuel supplies, and the impact of the volatility of fuel costs.

*Id.* The bill also deleted outdated provisions in section 476.53 regarding a cogeneration pilot program that the general assembly repealed in 2007 and amended the statute to apply to significant alterations of existing generating facilities. *Id.* The general assembly thought this bill was of such importance that it amended the bill to take immediate effect upon enactment. *Id.* § 3.

In interpreting section 476.53, we attempt to determine the general assembly's intent. *See State v. McCoy*, 618 N.W.2d 324, 325 (Iowa 2000). We "may not extend, enlarge or otherwise change the meaning of a statute" under the guise of construction. *Auen*, 679 N.W.2d at 590. Additionally, when the legislative history discloses that the general assembly may have amended a statute simply to remove doubt from a

previous statute, we are required to give effect to that purpose. *Barnett v. Durant Cmty. Sch. Dist.*, 249 N.W.2d 626, 629 (Iowa 1977). The rule for determining whether a legislative change in a statute modifies or clarifies the original statute is as follows:

> Where the original law was subject to very serious doubt, by permitting subsequent amendments to control the former meaning a great deal of uncertainty in the law is removed. And the legislature is probably in the best position to ascertain the most desirable construction. In addition it is just as probable that the legislature intended to clear up uncertainties, as it did to change existing law where the former law is changed in only minor details. Thus it has been asserted that "one well recognized indication of legislative intent to clarify, rather than change, existing law is doubt or ambiguity surrounding a statute." The New York court has established the following test: "The force which should be given to subsequent, as affecting prior legislation, depends largely upon the circumstances under which it takes place. If it follows immediately and after controversies upon the use of doubtful phraseology therein have arisen as to the true construction of the prior law it is entitled to great weight . . . . If it takes place after a considerable lapse of time and the intervention of other sessions of the legislature, a radical change of phraseology would indicate an intention to supply some provisions not embraced in the former statute."

*Orr v. Lewis Cent. Sch. Dist.*, 298 N.W.2d 256, 260 (Iowa 1980) (citation and internal quotation marks omitted).

Applying these principles, we find the general assembly did not intend the "need" requirement of section 476.53 to only include present capacity, but rather the general assembly also intended it to include needs based on other considerations such as fuel diversity, the supply of less expensive energy to consumers, and compliance with future environmental regulations requiring clean energy. We reach this conclusion for a number of reasons.

First, prior to the 2010 amendments, the statute stated it was the general assembly's intent that the statute be compatible with the environmental policies of the state, as expressed in Title XI of the Code, of which section 476.53 is a part. *See* Iowa Code § 476.53(2) (2009). Title XI deals with a myriad of environmental issues, including energy independence initiatives, such as those that reduce greenhouse gas emissions and carbon sequestration. *See, e.g., id.* § 469.9(4)(*b*)(3). Compliance with environmental regulations, present or future, requiring clean energy, diversifying fuel sources, and accounting for the impact of the volatility of fuel prices are the types of issues that would be consistent with Title XI. They are also consistent with a legislative intent that utilities plan prudently to provide reasonable and adequate service to retail customers at just and reasonable rates.

Second, when the general assembly amended the statute by adding the intent language in subsections (1) and (2), it did not make any substantive changes to the statute indicative of a legislative intent to change the statute's underlying goals or reasons. In subsection (2), the general assembly left intact the language indicating its intent that section 476.53 be compatible with Title XI and added the language requiring the consideration of "the diversity of the types of fuel used to generate electricity, the availability and reliability of fuel supplies, and the impact of the volatility of fuel costs." *See id.* § 476.53(2)(*b*) (2011). Moreover, while subsection (1) of the previous version indicated legislative intent to encourage the development of electric generating facilities to provide reliable service to consumers, the general assembly amended subsection (1) by simply adding language indicating its intent to encourage utilities to adapt their facilities for a carbon-constrained environment. *Compare id.* § 476.53(1) (2009), *with id.* § 476.53(1) (2011).

The amendment to the statute to permit its application to significant alterations of existing facilities furthers this intent. Therefore, the general assembly's inclusion of additional intent language in the statute, without making changes other than deleting outdated provisions, leads us to conclude the additional intent language clarified the original intent rather than adding a new intent.

Finally, at the time the general assembly added the intent language, the issue of whether the Board could consider these factors was being litigated in the courts. The timing of the amendment confirms that the general assembly was trying to clarify the law in this area. *See Barnett*, 249 N.W.2d at 629–30.

Therefore, we conclude the Board correctly construed section 476.53 to allow it to consider compliance with future environmental regulations, fuel diversity, the volatility of fuel prices, and the supply of less expensive energy to consumers.

**IV. Interpretation of Other Feasible Alternatives Under 476.53(4)(*c*)(2).**

Section 476.53(4)(*c*)(2) requires the Board to find that "the rate-regulated public utility has demonstrated to the board that [it] has considered other sources for long-term electric supply" and that its proposed facility "is *reasonable when compared to other feasible alternative sources of supply*." Iowa Code § 476.53(4)(*c*)(2) (2009) (emphasis added).

**A. Scope of Review.** The resolution of this issue also involves the Board's interpretation of section 476.53(4)(*c*)(2). Accordingly, we will review the Board's interpretation of "other feasible alternative sources of supply" under 476.53(4)(*c*)(2) for correction of errors at law pursuant to section 17A.19(10)(*c*).

**B. Analysis.** NextEra sets forth two reasons for its contention the Board failed to require MidAmerican to compare Wind VII with "other feasible alternatives." First, it argues that "other feasible alternatives" necessarily requires comparison to other generating facilities using the same power source, which in this case is wind. Second, it argues the Board improperly permitted MidAmerican to attempt to perform a postapplication comparison with a wind alternative during the Wind VII proceeding, instead of a preapplication comparison. It argues MidAmerican did not engage in commercial negotiations, but instead compared Wind VII with a sample NextEra purchase power agreement obtained through discovery. NextEra argues the Board's misapplication of the comparison requirement opens the door for utilities to avoid competition, which denies their customers the benefits that competition brings in contravention of Iowa public policy.

When the general assembly fails to provide a statutory definition or a word does not have an established meaning in law, we give the words their ordinary and common meaning by considering the context in which the general assembly used them. *State v. Stone*, 764 N.W.2d 545, 549 (Iowa 2009). "Considered" is the past tense of "consider," which means "to reflect on: think about with a degree of caution." *Webster's Third New International Dictionary* 483. "Other" is defined as "being the ones distinct from the one or those first mentioned or understood," i.e., an alternative. *Id.* at 1598. "Compared" is the past tense of "compare," which means "to examine the character or qualities of (as two or more . . . things) esp. for the purpose of discovering resemblances or differences." *Id.* at 462. "Feasible" means "capable of being . . . utilized . . . successfully." *Id.* at 831. Finally, "alternatives" is the plural form of

"alternative," which means "offering a choice of two or more things wherein if one thing is chosen the other is rejected." *Id.* at 63.

Taking these definitions together with the language of section 476.53(4)(*c*)(2), we conclude this section requires a utility to do no more than demonstrate its proposed facility is reasonable in light of the fact the utility cautiously thought about the character or qualities of alternative sources for long-term electric supply it could successfully utilize. The statute does not require the utility to compare the facility only to alternatives of the same generation source.

In addition, the intent of this Code section refers to, "electric power generating and transmission facilities." Iowa Code § 476.53(1). Therefore, this section of the Code is not limited solely to wind energy or other sources of renewable energy. Finally, the primary goals of section 476.53 are to "ensure reliable electric service to Iowa consumers and provide economic benefits to the state." *Id.* There are sources of long-term electric supply besides wind that meet these goals. In addition to conventional generation sources, such as fossil fuels, Iowa law recognizes renewable generation sources other than wind, including solar, biomass, and hydroelectric energies. *See id.* § 476.42(1)(*a*), (4) (defining "alternate energy production facility" and "small hydro facility").

Based on this analysis, the general assembly did not intend "other feasible alternatives" to include only alternatives of the same generation type. To achieve the general assembly's goals and considering the plain language of the statute, the only practical reading of section 476.53(4)(*c*)(2) is that it permits comparison with alternatives of different generation types. Therefore, the Board did not err in allowing MidAmerican to compare Wind VII to alternatives other than wind energy.

NextEra's second contention is the Board permitted MidAmerican to perform a postapplication comparison with a wind alternative during the Wind VII proceeding and the statute requires MidAmerican to perform this comparison prior to submitting its application for ratemaking principles. However, the plain language of section 476.53(4)(*c*)(2) does not require the utility to demonstrate it has performed the comparison prior to filing its application. Similarly, the section does not require a utility to compare its proposed facility with other proposed facilities. The only requirement under section 476.53(4)(*c*)(2) is that the utility compares its proposed facility to other feasible supply sources prior to receiving ratemaking principles.

Accordingly, the Board properly interpreted the other feasible alternatives language contained in section 476.53(4)(*c*)(2).

**V.  Substantial Evidence Claims.**

The next issue we must consider is whether substantial evidence supported the Board's findings that MidAmerican met the "need" requirement and considered other feasible alternatives of section 476.53(4)(*c*)(2).

**A.  Scope of Review.**  We must "reverse, modify, or grant other appropriate relief from agency action" that is "not supported by substantial evidence in the record . . . when that record is viewed as a whole." *Id.* § 17A.19(10)(*f*). The Iowa Administrative Procedure Act defines "substantial evidence" as follows:

> [T]he quantity and quality of evidence that would be deemed sufficient by a neutral, detached, and reasonable person, to establish the fact at issue when the consequences resulting from the establishment of that fact are understood to be serious and of great importance.

*Id.* § 17A.19(10)(*f*)(1).   When reviewing a finding of fact for substantial evidence, we adjudicate the finding "in light of all the relevant evidence in the record cited by any party that detracts from that finding . . . [or] that supports it."  *Id.* § 17A.19(10)(*f*)(3).  "The agency's decision does not lack substantial evidence merely because the interpretation of the evidence is open to a fair difference of opinion."  *ABC Disposal Sys., Inc. v. Dep't of Natural Res.*, 681 N.W.2d 596, 603 (Iowa 2004).

**B. The "Need" Requirement.**   In determining whether MidAmerican satisfied the "need" requirement of section 476.53(4)(*c*)(2), the Board could consider compliance with future environmental regulations requiring clean energy, fuel diversity, and the supply of less expensive energy to consumers.   The record reveals MidAmerican demonstrated Wind VII would defer a capacity deficiency from 2019 to 2020.  Furthermore, because of the benefits of Wind VII, MidAmerican is able to project a capacity deficiency of a mere 21 megawatts in 2020.

Further, the record contains substantial evidence Wind VII would satisfy a need for an electric supply with lower emissions, especially in light of potential future carbon legislation; a need for an electric supply that produces low-cost energy; a need for an electric supply that enhances fuel diversity; a need for MidAmerican to maintain reasonable prices for its customers; a need to promote economic development in Iowa; and a need to promote the use of renewable energy.

Therefore, substantial evidence supports the Board's finding of the "need" requirement under section 476.53(4)(*c*)(2).

**C. Other Feasible Alternatives.**   The record demonstrates MidAmerican compared wind generation generally to conventional and renewable generation alternatives prior to submitting its application and, prior to the Board's decision, MidAmerican compared Wind VII with

NextEra's purchase power agreement. MidAmerican's application for advance ratemaking principles generally compares wind power to renewable energy alternatives, including biomass energy, hydroelectric energy, solar energy, and geothermal energy based on availability, economic practicality, and maturity. It also compares wind power to coal- and gas-fired power plants in terms of cost, cost robustness, environmental reasonableness, system reliability, economic value to the local area, political uncertainty, flexibility, and diversity.

The testimony of MidAmerican's manager of market assessment further details MidAmerican's comparison of Wind VII to conventional and renewable generation alternatives. The record contains evidence as to MidAmerican's six-stage resource planning process, the different analytical models used during the process, and other criteria MidAmerican uses to further evaluate the attractiveness of other generation sources.

Accordingly, the record supports a finding that MidAmerican compared its proposed facility to other feasible supply sources prior to receiving ratemaking principles. Thus, substantial evidence supports the Board's finding that MidAmerican complied with the requirements of section 476.53(4)(*c*)(2) by demonstrating "to the board that the public utility has considered other sources for long-term electric supply and that the facility . . . is reasonable when compared to other feasible alternative sources of supply."

## VI. Applicability of Iowa Code Section 476.43.

We must next determine whether the Board erred in determining section 476.43 did not apply to MidAmerican's application for advance ratemaking principles. Section 476.43 requires, under certain

conditions, that electric utilities not discriminate against alternate energy producers.

**A. Scope of Review.**  The resolution of this issue involves the Board's interpretation of sections 476.43 and 476.44.  Accordingly, we will review the interpretation of sections 476.43 and 476.44 for correction of errors at law pursuant to section 17A.19(10)(*c*).

**B. Analysis.**  NextEra argues the Board failed to require MidAmerican to comply with Iowa Code section 476.43.  Section 476.43 provides, in relevant part:

> 1. *Subject to section 476.44*, the board shall require electric utilities to do both of the following under terms and conditions that the board finds are just and economically reasonable for the electric utilities' customers, are nondiscriminatory to alternate energy producers and small hydro producers, and will further the policy stated in section 476.41:
>
> *a.* At least one of the following:
>
> (1) Own alternate energy production facilities or small hydro facilities located in this state.
>
> (2) Enter into long-term contracts to purchase or wheel electricity from alternate energy production facilities or small hydro facilities located in the utility's service area.
>
> *b.* Provide for the availability of supplemental or backup power to alternate energy production facilities or small hydro facilities on a nondiscriminatory basis and at just and reasonable rates.

Iowa Code § 476.43 (emphasis added).  The Board found section 476.43 did not apply to this situation because of an exception contained in section 476.44.  In particular, the Board relied on the following exception:

> 2. *a.* An electric utility subject to this division, except a utility that elects rate regulation pursuant to section 476.1A, shall not be required to own or purchase, at any one time,

> *more than its share of one hundred five megawatts* of power from alternative energy *production facilities* or small hydro facilities at the rates established pursuant to section 476.43.

*Id.* § 476.44(2)(*a*) (emphasis added).

The language of sections 476.43 and 476.44 clearly and unambiguously provide that a utility that owns or purchases, "at any one time, more than its share of one hundred five megawatts of power from alternative energy production facilities" is exempt from the requirements of section 476.43. The record establishes that even without Wind VII, MidAmerican owns 1,284.3 megawatts of wind-powered generation and purchases another 109.1 megawatts of wind power. Accordingly, the Board correctly found that MidAmerican is exempt from the requirements of section 476.43 because it already meets the statutorily required minimum of 105 megawatts.

### VII. Equal Protection Claim.

We must next determine whether the Board's decision to grant MidAmerican advance ratemaking principles for Wind VII violates the Equal Protection Clauses of the United States or Iowa Constitutions.

**A. Scope of Review.** We can grant relief from agency action if the action is "[u]nconstitutional on its face or as applied or is based upon a provision of law that is unconstitutional on its face or as applied." *Id.* § 17A.19(10)(*a*). We do not give any deference to the agency with respect to the constitutionality of a statute or administrative rule because it is entirely within the province of the judiciary to determine the constitutionality of legislation enacted by other branches of government. *ABC Disposal Sys.*, 681 N.W.2d at 605; *see also* Iowa Code § 17A.19(11)(*b*). Accordingly, we review constitutional issues in agency proceedings de novo. *Swanson v. Civil Commitment Unit for Sex Offenders*, 737 N.W.2d 300, 306 (Iowa 2007).

**B. Analysis**. NextEra contends the Board's application of section 476.53, as applied to subsidize a wholesale market endeavor, violates the Equal Protection Clause of the Fourteenth Amendment of the United States Constitution and the equal protection provision found in article I, section 6 of the Iowa Constitution. By its terms, section 476.53 only applies to rate-regulated utilities. MidAmerican is a rate-regulated public utility obligated to serve all retail electric customers in its exclusive service territory. NextEra is an independent wholesale energy producer. Therefore, NextEra is ineligible for ratemaking principles treatment under section 476.53 because it is not a rate-regulated public utility. The proper determination is broader than that urged by NextEra. The issue is not whether the Board's application of section 476.53 to MidAmerican in this case was unconstitutional, but rather, whether any application of section 476.53 to a rate-regulated utility that may engage in competition in the wholesale energy market is unconstitutional because it violates the constitutional guarantees of equal protection.

The Equal Protection Clause of the Fourteenth Amendment of the United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. The Iowa Constitution's counterpart to the federal clause provides that "[a]ll laws of a general nature shall have a uniform operation; the general assembly shall not grant to any citizen, or class of citizens, privileges or immunities, which, upon the same terms shall not equally belong to all citizens." Iowa Const. art. I, § 6. Corporations are persons for the purposes of equal protection. *See Chi. & N.W. Ry. v. Fachman,* 255 Iowa 989, 995, 125 N.W.2d 210, 213 (1963); *McGuire v. Chi., B. & Q.R. Co.,* 131 Iowa 340, 350, 108 N.W. 902, 905 (1906); s*ee also Wheeling Steel Corp. v. Glander,* 337 U.S. 562, 571–72,

69 S. Ct. 1291, 1296, 93 L. Ed. 1544, 1551 (1949) (finding that, where a state has chosen to domesticate foreign corporations, the adopted corporations are entitled to equal protection with the state's own corporate progeny).

When a party raises an issue involving parallel provisions of the State and Federal Constitutions, a number of principles emerge from our cases. First, we jealously reserve the right to develop an independent framework under the Iowa Constitution. *Racing Ass'n of Cent. Iowa v. Fitzgerald (RACI)*, 675 N.W.2d 1, 5 (Iowa 2004). Second, when a party does not urge that we adopt a standard under the Iowa Constitution different from that under the Federal Constitution, we generally proceed under the standard proposed by the party. *See, e.g.*, *id.* at 6. Even in cases where a party has not suggested that our approach under the Iowa Constitution should be different from that under the Federal Constitution, we reserve the right to apply the standard in a fashion at variance with federal cases under the Iowa Constitution. *See, e.g.*, *State v. Pals*, 805 N.W.2d 767, 771–72 (Iowa 2011); *Varnum v. Brien*, 763 N.W.2d 862, 896 n.23 (Iowa 2009); *RACI*, 675 N.W.2d at 6; *State v. Cline*, 617 N.W.2d 277, 283 (Iowa 2000), *overruled in part on other grounds by State v. Turner*, 630 N.W.2d 601, 606 n.2 (Iowa 2001); *Bierkamp v. Rogers*, 293 N.W.2d 577, 579 (Iowa 1980). In this case, NextEra has not urged that we apply equal protection principles under the Iowa Constitution that depart from established federal principles. Therefore, we proceed to consider this case under the established federal equal protection principles, recognizing, however, that we may apply them differently under the Iowa Constitution.

Essentially, "[t]he Equal Protection Clause requires that similarly-situated persons be treated alike." *Bowers v. Polk Cnty. Bd. of*

*Supervisors*, 638 N.W.2d 682, 689 (Iowa 2002). Therefore, there is a threshold determination in all equal protection challenges as to whether persons are similarly situated. " 'If people are not similarly situated, their dissimilar treatment does not violate equal protection.' " *Id.* (quoting *In re Morrow*, 616 N.W.2d 544, 547 (Iowa 2000)).

Once it is determined persons are similarly situated, we apply one of three different levels of scrutiny depending on the type of legislative classification under attack. *Sherman v. Pella Corp.*, 576 N.W.2d 312, 317 (Iowa 1998). We apply strict scrutiny to "classifications based on race, alienage, or national origin and those affecting fundamental rights." *Varnum*, 763 N.W.2d at 880. We apply intermediate scrutiny to classifications based on gender, illegitimacy, or sexual orientation. *Id.* at 880, 896. Finally, we apply a rational basis analysis to all other classifications. *Id.* at 879.

Although the parties disagree as to whether MidAmerican and NextEra are similarly situated, they correctly agree that the legislative classification at issue is not one requiring any more than rational basis scrutiny. Therefore, we will apply a rational basis analysis.

The rational basis test is a "very deferential standard." *Id.* Under this lowest level of scrutiny, "[t]he plaintiff has the heavy burden of showing the statute unconstitutional and must negate every reasonable basis upon which the classification may be sustained." *Bierkamp*, 293 N.W.2d at 579–80. A statute satisfies the requirements of equal protection as long as

> "there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational."

*Varnum*, 763 N.W.2d at 879 (quoting *RACI*, 675 N.W.2d at 7). We have stated this test more succinctly as requiring that " 'classifications drawn in a statute are reasonable in light of its purpose.' " *RACI*, 675 N.W.2d at 7 (quoting *McLaughlin v. Florida*, 379 U.S. 184, 191, 85 S. Ct. 283, 288, 13 L. Ed. 2d 222, 228 (1964)). "A classification is reasonable if it is 'based upon some apparent difference in situation or circumstances of the subjects placed within one class or the other which establishes the necessity or propriety of distinction between them.' " *Morrow*, 616 N.W.2d at 548 (quoting *State v. Mann*, 602 N.W.2d 785, 792 (Iowa 1999)). Furthermore, "[a] classification 'does not deny equal protection simply because in practice it results in some inequality; practical problems of government permit rough accommodations . . . .' " *Id.*

The threshold determination is whether MidAmerican and NextEra are similarly situated. NextEra argues they are similarly situated with respect to the application of section 476.53 to a wholesale market venture. We will assume, without deciding, that NextEra and MidAmerican are similarly situated because NextEra has failed to prove that there is not a rational basis between section 476.53 and a legitimate state interest.

The Board found that even if NextEra and MidAmerican were similarly situated, NextEra did not meet its burden of showing that the statute is unconstitutional by negating every reasonable basis upon which the classification may be sustained. The Board found:

> the General Assembly determined that there were valid reasons for the different treatment, including the General Assembly's conclusion that traditional ratemaking provided inadequate incentives for rate-regulated utilities to build new generation. Ratemaking principles were limited to rate-regulated utilities because those are the only companies subject to the Board's rate jurisdiction and therefore the only companies that could be reasonably influenced by the

statute to build generation. Even if the Board wanted to, there are no incentives that it could give to NextEra . . . to build new generation because the Board has no jurisdiction over [its] rates or [return on equity] levels.

NextEra does not contend these are not legitimate state interests. Instead, NextEra attacks the Board's conclusions. It attacks the Board's first conclusion that the legislature concluded that "traditional ratemaking provided inadequate incentives for rate-regulated utilities to build new generation" as ignoring NextEra's argument that Iowa Code section 476.53 is unconstitutional as applied to subsidize a wholesale market endeavor. Second, it attacks the Board's conclusion that "[r]atemaking principles were limited to rate-regulated utilities because those are the only companies subject to the Board's rate jurisdiction" as circular reasoning. NextEra essentially seeks to have the court invalidate section 476.53 as far as it awards ratemaking principles to public utilities that engage in competition in the wholesale market because NextEra feels that a public utility exceeds the scope of its role when selling energy in the wholesale market.

NextEra's contentions are misguided. The primary purpose of a public electric utility is to furnish electricity to the public. The legislative intent of section 476.53 is clear that public utilities are to furnish electricity in an efficient, reliable manner. Iowa Code §§ 476.1, 476.53. This implies a public utility should strive to decrease the cost at which it supplies electricity to consumers while at the same time ensuring reliable service. To further this goal, section 476.53 allows rate-regulated utilities to receive advance ratemaking principles. The record establishes selling energy in the wholesale market allows MidAmerican to reduce rates at which its retail customers purchase energy. Furthermore, Wind VII allows MidAmerican to meet the needs of its retail customers, which

include maintaining a diverse fuel supply and acting in compliance with environmental regulations. These considerations aid in keeping the price of electricity low for MidAmerican's retail customers.

As the Office of the Consumer Advocate points out in its brief, the general assembly was forced to limit its grant of advance ratemaking principles to rate-regulated utilities because they were the only companies subject to the State's ratemaking jurisdiction. Companies that did not provide energy to retail consumers in Iowa, like NextEra, were, and still are, completely beyond the State's ratemaking influence. Such a difference is reasonable and consistent with the constitutional guarantee of equal protection. The State cannot influence NextEra to provide electric service to Iowa consumers or economic benefits to the state. Instead, NextEra is only subject to federal regulation when it sells energy in the wholesale market.

Therefore, applying the rational basis test traditionally or independently in a more rigorous fashion as we did in *RACI*, *compare RACI*, 675 N.W.2d at 16 (finding a violation of the equal protection clause of the Iowa Constitution by applying the federal analytical framework), *with Fitzgerald v. Racing Ass'n of Cent. Iowa*, 539 U.S. 103, 110, 123 S. Ct. 2156, 2161, 156 L. Ed. 2d 97, 105 (2003) (finding no violation of the Equal Protection Clause of the Federal Constitution when applying the traditional federal analytical framework), NextEra has failed to demonstrate a lack of factual basis for the asserted legitimate purposes. Thus, the granting of advance ratemaking principles to MidAmerican does not violate the guarantee of equal protection under the State or Federal Constitution even if it seeks to compete in the wholesale energy market.

**VIII. Commerce Clause Claim.**

Next, we must decide if the Commerce Clause of the United States Constitution prohibits the Board from granting MidAmerican's application.

**A. Scope of Review.** We review constitutional issues raised in agency proceedings regarding the Commerce Clause de novo. *KFC Corp. v. Iowa Dep't of Revenue*, 792 N.W.2d 308, 312 (Iowa 2010), *cert. denied,* ___ U.S. ___, ___, 132 S. Ct. 97, 98, 181 L. Ed. 2d 26, ___ (2011).

**B. Analysis.** NextEra asserts the Board's decision violates the Commerce Clause of the United States Constitution because it unlawfully applies section 476.53 as a mechanism that allows ratepayer subsidization of MidAmerican's wholesale market endeavors. The Commerce Clause grants Congress the power "[t]o regulate Commerce . . . among the several States." U.S. Const., art. I, § 8, cl. 3. Although the Commerce Clause is an affirmative grant of power to Congress, since the nineteenth century the United States Supreme Court has interpreted the Clause to have a negative implication. *KFC Corp.*, 792 N.W.2d at 313. This implication, known as the "negative" or "dormant" Commerce Clause, "limits the power of the states to erect barriers against interstate trade." *Iowa Auto. Dealers Ass'n v. Iowa State Appeal Bd.*, 420 N.W.2d 460, 462 (Iowa 1988).

We have adopted the two-tiered approach of the United States Supreme Court to analyze state economic regulation under the Commerce Clause. *Id.* The approach is as follows:

> "When a state statute *directly* regulates or discriminates against interstate commerce, or when its *effect* is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only *indirect effects* on interstate commerce and regulates evenhandedly, we have

> examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits."

*Id.* (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S. Ct. 2080, 2084, 90 L. Ed. 2d 552, 559–60 (1986) (citations omitted)). "Discrimination" in this context means "differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys., Inc. v. Dep't of Environmental Quality*, 511 U.S. 93, 99, 114 S. Ct. 1345, 1350, 128 L. Ed. 2d 13, 21 (1994). A discriminatory restriction on interstate commerce "is virtually *per se* invalid." *Id.* However, if we find "the statute regulates evenhandedly to effectuate a legitimate local public interest," then "the extent of the burden that will be tolerated depends on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities." *Iowa Auto. Dealers Ass'n*, 420 N.W.2d at 462–63.

Section 476.53 permits rate-regulated utilities to obtain advance ratemaking principles when building new facilities. Section 476.53 does not discriminate based on a company's residency. Instead, it discriminates based on whether a company is a rate-regulated utility.

NextEra argues the Board's application of section 476.53 has the effect of favoring in-state economic interests because it allows Iowa public utilities to get a benefit in the wholesale market that is unavailable to entities that do not serve Iowa retail customers. We disagree.

The Board's decision to grant advance ratemaking principles to MidAmerican does not affect NextEra or favor in-state economic interests. The Board's decision is entirely based on the fact MidAmerican is a rate-regulated utility in Iowa. The impact, or lack thereof, on

NextEra would be the same if NextEra was located wholly within Iowa or completely outside Iowa because NextEra is not a rate-regulated Iowa utility. Similarly, the Board's decision does not affect the sale of NextEra's products based on whether they are sold in Iowa.

NextEra contends there are striking similarities between the Board's decision and *Alliance for Clean Coal v. Miller*, 44 F.3d 591 (7th Cir. 1995). NextEra's reliance on *Alliance for Clean Coal* is misplaced. In *Alliance for Clean Coal*, coal suppliers from western states sued the Illinois Commerce Commission and challenged an Illinois statute that encouraged Illinois electric utilities to continue to burn coal mined in Illinois despite the availability of cleaner, out-of-state coal. 44 F.3d at 593–94. The Illinois Coal Act encouraged the use of Illinois coal by allowing Illinois utilities to pass along the added costs of such coal to Illinois ratepayers. *Id.* This effectively made out-of-state coal a more expensive option for Illinois utilities. The Seventh Circuit Court of Appeals concluded the statute violated the Commerce Clause because it had "the same effect as a 'tariff or customs duty'" placed on out-of-state coal that would burden the flow of commerce across state lines. *Id.* at 595 (quoting *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 194, 114 S. Ct. 2205, 2212, 129 L. Ed. 2d 157, 167 (1994)).

NextEra ignores the key difference between the statute at issue in *Alliance for Clean Coal* and section 476.53. The Illinois statute effectively discriminated against out-of-state producers by creating a tariff on out-of-state coal. This tariff had the effect of "'neutralizing the advantage possessed by lower cost out-of-state producers.'" *Id.* Section 476.53 is not a tariff, nor would it treat NextEra or its products differently based on whether NextEra was located wholly inside or outside of Iowa.

Therefore, section 476.53 does not have the effect of favoring Iowa economic interests over non-Iowa economic interests.

However, because it is possible that energy produced by Wind VII will end up in the wholesale market, it is possible that the Board's decision to grant ratemaking principles pursuant to section 476.53 will indirectly affect interstate commerce. As NextEra correctly points out, this burden would be the potential presence of state-subsidized electricity in the wholesale market. It would be in direct competition with non-state-subsidized electricity, produced by companies like NextEra. NextEra is also correct that advance ratemaking principles allow MidAmerican to shift risk to its retail customers by guaranteeing returns on equity even if the demand for electricity and the attached price fail to meet MidAmerican's projections.

We find the burden on the wholesale market, if any, would be minimal. Once completed, Wind VII will be able to produce up to 1001 megawatts of electricity. MidAmerican's director of environmental programs, compliance, and permitting testified that "there are over 130,000 megawatts of electric generation capacity currently in the market footprint of the MidWest Independent Transmission System Operator, Inc. (MISO)." MISO is the energy market in which MidAmerican competes. The testimony revealed there are an additional 165,000 megawatts of generating capacity in the footprint of the PJM Interconnection, Inc. L.L.C., which operates as a common market with MISO. The testimony further revealed MISO's annual growth requirements far exceeded the size of Wind VII. This means Wind VII, at most, would account for 0.76 percent of MISO. If we add the 165,000-megawatt capacity of the PJM, then Wind VII only accounts for 0.34

percent of the market. Therefore, it seems any burden Wind VII might have on these large interstate markets would be slight.

The local benefits of Wind VII, on the other hand, would be considerable. As the district court pointed out, "Wind VII would provide MidAmerican's retail customers with a clean, renewable power source with no inherent fuel costs, and help insulate its retail customers from spikes in fossil fuel costs." It is also reasonable to believe that MidAmerican's retail customers will use the electricity produced by Wind VII because the wind farm will be located in Iowa.

Therefore, section 476.53 does not directly regulate or discriminate against interstate commerce, and it does not have the effect of favoring in-state economic interests over out-of-state economic interests. Even though it may indirectly affect interstate commerce, any burden section 476.53 places on interstate commerce does not exceed the local benefits.

**IX. Disposition.**

We affirm the judgment of the district court affirming the judgment of the Board because in this appeal we find (1) the Board properly interpreted and applied section 476.53, (2) substantial evidence supported the Board's findings, (3) section 476.43 is not applicable to this ratemaking proceeding, and (4) section 476.53 as applied to a rate-regulated public utility that may compete in the wholesale energy market does not violate the Equal Protection Clauses of the Iowa or United States Constitutions or the Commerce Clause of the United States Constitution.

**AFFIRMED.**

All justices concur except Mansfield, J., who concurs specially, and Waterman and Zager, JJ., who take no part.

**MANSFIELD, Justice (concurring specially).**

I concur in the result only. This proceeding involves an effort by MidAmerican Energy to have Iowa's ratepayers shoulder the costs of a new wind energy project even though MidAmerican does not forecast a need for additional capacity until 2019. The majority comments at several points on the desirability of the project. Generally speaking, I feel less qualified to reach these conclusions but more confident about the Iowa Utilities Board's authority to approve the project.

### I. Deference to the Iowa Utilities Board.

The first question before us is the deference we are required to give to the Board's interpretations of section 476.53 of the Iowa Code. I believe the majority's refusal to grant deference is flawed and contrary to precedent.

Historically, we have deferred to the Iowa Utilities Board's interpretation of the complex and technical laws that it administers. In doing so, we have relied upon the legislature's grants of rulemaking authority to the Board. *See, e.g.*, Iowa Code §§ 476.2(1), 476.103(1) (2009). Thus, in *City of Coralville v. Iowa Utilities Board*, we said that the Board "has clearly been vested with authority to interpret the 'rates and services' provision of section 476.1, and we may therefore overturn its interpretation only if it is 'irrational, illogical, or wholly unjustifiable.' " 750 N.W.2d 523, 527 (Iowa 2008) (quoting Iowa Code § 17A.19(10)(*l*)); *see also Evercom Sys., Inc. v. Iowa Utils. Bd.*, 805 N.W.2d 758, 762–63 (Iowa 2011) (stating that the utility board's interpretation of a provision in chapter 476 should only be reversed if it is "irrational, illogical, or wholly unjustifiable"); *Office of Consumer Advocate v. Iowa Utils. Bd.*, 744 N.W.2d 640, 643–44 (Iowa 2008) (same); *AT&T Commc'ns of the Midwest,*

*Inc. v. Iowa Utils. Bd.*, 687 N.W.2d 554, 561 (Iowa 2004) (same); *Office of Consumer Advocate v. Iowa Utils. Bd.*, 663 N.W.2d 873, 876 (Iowa 2003) (stating "the board's interpretation of the applicable statutes is entitled to 'appropriate deference' " (citation omitted)).

True, we held in *Renda v. Iowa Civil Rights Commission* that a grant of rulemaking authority generally does not give an agency interpretive authority over a term that "has an independent legal definition," such as "employee." 784 N.W.2d 8, 14 (Iowa 2010). But I do not believe we overturned our prior decisions requiring deference to IUB legal interpretations within the Board's area of expertise. Certainly we did not say in *Renda* that we were overruling those cases. To the contrary, in *Renda* we cited *City of Coralville* with approval, acknowledging that the Board had been vested with authority to interpret "provisions relating to the regulation of public utility rates and services." *Id.* (citing *City of Coralville*, 750 N.W.2d at 527).

Furthermore, less than a year ago, and after *Renda*, we decided *Evercom Systems*. There, the Board had instituted a civil penalty against Evercom Systems for "cramming," a "violation based on improper billing for collect telephone calls." *Evercom Sys.*, 805 N.W.2d at 760. We first had to determine the appropriate standard of review for the "Board's interpretation of the term 'unauthorized change in service' under Iowa Code section 476.103, and the Board's interpretation of the definition of 'cramming' as that term is defined in Iowa Administrative Code rule 199—22.23(1)." We explained:

> Section 476.103(3) requires the Board to "adopt rules prohibiting an unauthorized change in telecommunication service." While this command from the legislature is not an explicit grant of the authority to interpret the term "unauthorized change in telecommunications service," *see Renda*, 784 N.W.2d at 13, we have held that the rule making

> requirement contained in section 476.103 "evidences a clear legislative intent to vest in the Board the interpretation of the unauthorized-change-in-service provisions in section 476.103." *Office of Consumer Advocate*, 744 N.W.2d at 643. The term "unauthorized change in service" is a "substantive term within the special expertise of the agency" and, therefore, we will only reverse the agency's interpretation of that term if it is irrational, illogical, or wholly unjustifiable. *Renda*, 784 N.W.2d at 14.

*Id.* at 762–63.

Unfortunately, my colleagues in the majority forsake precedent without discussing it. Instead, the majority relies on dictionary definitions of "govern" and "exercise" to conclude that section 476.2(1) does not grant *any* interpretive authority to the Board at all. I question the majority's effort to "make a fortress out of the dictionary," *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir. 1945) (Hand, J.), and believe there are multiple problems with the majority's analysis.

For one thing, the majority does not read section 476.2(1) in its entirety. Just before the grant of rulemaking authority is a statement that "[t]he board shall have broad general powers to effect the purposes of this chapter." Iowa Code § 476.2(1). If the Board has broad powers, it is logical to defer to the Board's legal interpretations of technical terms, as we have done in the past. The majority also disregards our determination in *City of Coralville* that the Board had "clearly been vested with authority" to interpret a term in section 476.1 and therefore its interpretation might only be overturned if "irrational, illogical, or wholly unjustifiable." 750 N.W.2d at 527 (citing Iowa Code § 17A.19(10)(*l*)). Although we did not expressly state where that authority came from, it could only have come from section 476.2(1).

Furthermore, even the majority concedes that its dictionary definitions do not get it as far as it needs to go. Instead, after quoting *Webster's*, the majority concludes that the sentence regarding

rulemaking in section 476.2(1) is merely "ambiguous" as to the extent of the Board's authority, so it relies on the next sentence that makes the Board "subject to the provisions of chapter 17A." *See* Iowa Code § 476.2(1). How this justifies the majority's conclusion is a mystery to me. Obviously, the Board is subject to the provisions of the Iowa Administrative Procedure Act. This totally begs the question, however, of *which* provision of the Act—section 17A.19(10)(*c*) (no deference required) or section 17A.19(10)(*l*) (deference required)—applies here.

The majority also fails to take into account that the legal requirements at issue—the "need" and "consideration of alternatives" requirements of section 476.53—are technical matters as to which the Board has more expertise than ourselves. This is not a *Renda*-type situation involving the interpretation of isolated terms that "have specialized legal meaning and are widely used in [other] areas of law." *Renda*, 784 N.W.2d at 14. The majority obscures this point by again citing *Webster's* for dictionary definitions of commonplace *nonlegal* words like "consider," "other," "compare," "feasible," and "alternatives." But as before, this retreat into the fortress only gets it so far. Because section 476.53 *combines* these everyday words with "substantive term[s] within the special expertise of the agency," *id.*, like "sources for long-term electric supply," I think we are required to defer to the Board's interpretations of these provisions taken as a whole, as we have done in our prior utility cases. Iowa Code § 476.53(3).

It is true the majority ultimately sustains the Board's action in this case. However, its refusal to accord any deference to the Board's

interpretation of utility law is troubling and, if continued, will have adverse implications in future cases.[2]

## II. Whether the Project Is Needed and Other Feasible Alternatives Were Considered.

The next question is whether the Wind VII project meets the requirements of section 476.53(3)(*c*)(2). As noted by my colleagues, the statute requires that the utility have "considered other sources for long-term electric supply" and that the facility be "reasonable when compared to other feasible alternative sources of supply." *Id.* at (3)(*c*)(2). I agree with the Board that this section "does not specifically require consideration of the 'capacity need' or 'energy need' . . . for a proposed facility." Yet it is implicit in the foregoing language that there be a need for the facility. At some point it would likely raise legal, if not constitutional, problems if a utility built a facility simply to serve nonretail customers while incorporating the costs of that facility into its retail rate base. Having said that, I believe the Board has permissibly interpreted the statute as allowing a broad consideration of the benefits of the facility to retail customers to be taken into account in determining need. Such benefits may include the allocation of lower-cost energy to retail customers, the diversity of energy sources, and the avoidance of potential environmental regulations associated with fossil fuels. In light of this interpretation, I also believe that substantial evidence supports

---

[2]Notwithstanding my colleagues' statements about not deferring to the Board's legal interpretation of section 476.53, they may be according more deference than they let on. For example, the majority says, "The Board correctly construed section 476.53 to *allow it* to consider compliance with future environmental regulations, fuel diversity, the volatility of fuel prices, and the supply of less-expensive energy to consumers." (Emphasis added.) I agree that the Board may, *but is not required to*, consider these factors in determining whether advance ratemaking principles are appropriate. I support the deferential tone of this statement.

the Board's factual finding that "MidAmerican has established the need for the facility and its benefits to retail customers."

I do not agree with the Board or the majority, however, that "promot[ing] economic development" can be cited here as a justification for the order granting advance ratemaking principles to Wind VII. The Board and my colleagues do not explain how Wind VII promotes economic development other than by the fact that MidAmerican will be making a capital expenditure. By this standard, virtually any capital expenditure made by a utility (with the costs borne by the utility's retail customers) would meet the "need" requirement of section 476.53(3)(*c*)(2). Notably, neither MidAmerican itself nor the Office of Consumer Advocate cites the economic development justification in its briefing.

Turning to the feasible alternatives issue, the majority appears to conclude that section 476.53 imposes a procedural requirement only. That is, MidAmerican only has to perform a comparison with other energy sources, regardless of what the comparison may show. I disagree. The statute not only requires MidAmerican to demonstrate that it "has considered other sources for long-term electric supply," it also requires MidAmerican to demonstrate that the facility "*is reasonable* when compared to other feasible alternatives." Iowa Code § 476.53(3)(*c*)(2) (emphasis added). The latter is a substantive requirement. Under the Board's interpretation of this part of section 476.53, with which I agree and to which I defer, the proposed facility must be a "reasonable option." I believe substantial evidence supports the Board's finding that it is.[3]

**III. Equal Protection.**

The equal protection issues here are quite simple.

---

[3]I agree with the majority and the Board that section 476.43 does not apply here because MidAmerican has met the statutorily required minimum of 105 megawatts.

Iowa law permits a regulated utility (MidAmerican) to build a wind facility and include the costs of that facility in its rate base even though an unregulated utility (NextEra) erecting the same facility would not have the same privilege. *See id.* § 476.53. Yet NextEra appears to concede that it would not be an equal protection violation if MidAmerican used Wind VII only to supply its local retail customers. Rather, NextEra urges that it violates equal protection if MidAmerican can also compete in the wholesale market with NextEra. In that sense, NextEra is complaining about *equal* treatment—i.e., the fact that both entities may sell wholesale power—rather than unequal treatment. Notably absent from NextEra's briefing is any indication that it wishes to become a regulated utility in Iowa.

In any event, MidAmerican has obligations that NextEra does not have. MidAmerican must serve customers within its service area, and its rates are subject to regulation. *See id.* §§ 476.3, 476.20, 476.22–.26. The Board has also indicated that wholesale sales revenue from Wind VII will be included in revenue sharing calculations for ratemaking purposes through 2013, and thereafter, the Board has reserved the question of how the wholesale sales revenue will be treated for ratemaking purposes. Thus, even though both entities may compete in the wholesale market, the legislature could still rationally conclude that the benefits of being a regulated utility are compensated by the drawbacks. Functionally, the constitutional question here is similar to what it was in *City of Coralville*. In that case, the argument was made that some Coralville residents would receive the benefits of MidAmerican's undergrounding of power lines without bearing the costs because they were not within MidAmerican's service area. *City of Coralville*, 750 N.W.2d at 530. That was alleged to be an equal protection violation. Without much difficulty,

we concluded it was not. *See id.* at 530–31. This case presents an arguably similar situation in that wholesale customers of Wind VII may receive the benefits of the project without having to bear its capital costs in their rate base.

My colleagues conclude that granting advance ratemaking principles for Wind VII will "aid in keeping the price of electricity low for MidAmerican's retail customers." I do not think it is necessary or appropriate for us to draw this conclusion. I am not an economist, an expert on finance, or a regulator of utilities. But I am confident that a rational basis exists for the legislature's determination that MidAmerican can receive advance ratemaking principles for this project even though some of the power will be sold on the wholesale market. *See King v. State*, __ N.W.2d __, (Iowa 2012) (applying the rational basis test).

## IV. Commerce Clause.

The majority's Commerce Clause discussion is unduly complicated and, in part, incorrect. We do follow the United States Supreme Court's two-tiered approach to Commerce Clause cases:

> When a state statute *directly* regulates or discriminates against interstate commerce, or when its *effect* is to favor in-state economic interests over out-of-state interests, we have generally struck down the statute without further inquiry. When, however, a statute has only *indirect effects* on interstate commerce and regulates evenhandedly, we have examined whether the State's interest is legitimate and whether the burden on interstate commerce clearly exceeds the local benefits.

*Iowa Auto. Dealers Ass'n v. Iowa State Appeal Bd.*, 420 N.W.2d 460, 462 (Iowa 1988) (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579, 106 S. Ct. 2080, 2084, 90 L. Ed. 2d 552, 559 (1986)).

Section 476.53 passes the first threshold because it does not discriminate against out-of-state interests. MidAmerican and NextEra are treated differently not because one is an in-state company and the other is not (indeed, MidAmerican's ultimate parent is based in Omaha), but because one is a regulated utility and the other is not. So far, I agree with the majority.

However, I believe the majority misapplies the second tier of the analysis, which asks whether the statute unduly burdens interstate commerce. The majority concludes that MidAmerican's interstate sales of power generated by Wind VII would be a "burden" on interstate commerce but only a "slight" one, outweighed by the "considerable benefits" to local consumers from Wind VII.

Again, given my lack of expertise, I hesitate to predict that Wind VII will be a boon for Iowans served by MidAmerican. But I think we need not reach that question because the majority's premise is mistaken. How are *increased sales* in interstate commerce a "burden" on interstate commerce at all?

## V. Conclusion.

For the foregoing reasons, I concur in the result only.